Cardozo, J.
 

 The plaintiff’s first cause of action is for commissions earned as the defendant’s salesman. His second cause of action is for damages because of the breach of the contract under which he was employed. He has recovered a judgment for the commissions, but his claim for damages has been dismissed. The case comes here on cross-appeals. The defendant is aggrieved because the plaintiff has recovered anything; the plaintiff, because he has not recovered more.
 

 In 1901, when his dealings with the defendant began, the plaintiff was engaged, on his own account, in the sale of paints and painters’ supplies. The defendant had for some time manufactured paint for its own use exclusively, but in 1901 it determined to enter the general market. It sought an introduction to that market through the mediumship of the plaintiff. The plaintiff was to stop buying his paint from other manufacturers and to buy solely from the defendant. In return he was to have the privilege of handling its entire output. .There was to be no relation of agency between them. The plaintiff was to buy the paint and the defendant was to sell it. Upon this basis, in May, 1901, their dealings began. The plain
 
 *187
 
 tiff broke off all connection with other manufacturers and allied himself with the defendant exclusively, and between May, 1901, and April,. 1903, his purchases amounted to $125,000. Many of his customers complained of the quality of the paint which he supplied to them from the defendant’s factory, and he carried these complaints to the defendant’s superintendent. He said that he was losing his trade; that his customers were leaving him, and that those who remained with him were exacting allowances because of the defects. Again and again, so he tells us, the defendant’s superintendent assured him that if he would keep track of the bad goods and try to reclaim the trade the defendant would make it right with him, and repay him for any loss. When this settlement was to be made, his testimony does not enlighten us. The time for the adjustment was as indefinite as the items to be adjusted. But in varying forms, if vaguely, the plaintiff, according to his own narrative, was made to understand that in return for his co-operation in developing this new branch of the defendant’s business his losses due to the defendant’s defective goods, whether resulting in the concession of allowances to customers or in diverted trade, would, at some time, when settling day arrived, be made good from' the defendant’s coffers. The defendant’s superintendent denies, though at times somewhat feebly, that anything was ever said to give reason for that belief.
 

 In April, 1903, the dealings between the plaintiff and the defendant had continued for nearly two years, and there was then due from the plaintiff, according to the defendant’s books, a balance of $27,650.79. A change was then made in the relation between them. The plaintiff ceased to buy paint from the defendant, and became its agent under a contract to serve it for a commission. Before the contract was made he had, so he claims, an understanding that the entire balance of $27,650.79, with the exception of an amount vaguely stated as about $5,200 or $5,300, would be canceled to compensate him
 
 *188
 
 for the loss which he had suffered. An indebtedness of nearly $23,000 was thus wiped out, as he asserts, without a scratch of a pen. His statement is that in March, 1903, he told the defendant’s superintendent that he had figured his losses; that the value of the lost trade was approximately $14,000; "that the allowances to customers and some other items came to about $9,000, and that there was $5,200 or $5,300 due, which he would pay in installments. To this announcement, he says that the superintendent made no answer. There was, even if the plaintiff’s narrative be accepted, no word of approval. “ And then I said, ‘ What are you going to do about it ? ’ And not a word out of him.” The plaintiff made a claim of loss, and the defendant listened to it in silence.
 

 The contract of employment on a commission basis was made about a fortnight later. It is described, in its opening words, as an
 
 “
 
 agreement made and entered into this first day of April, A. D. 1903, by and between John J. Moran, party of the first part, and the Standard Oil Company of Hew York, by its agent, James G-. Hew-comb, party of the second part.” The plaintiff
 
 “
 
 agrees to sell for the term of five years from the date hereof, for and on account of the party of the second part, certain paints, oils, varnishes, etc., a list of which is hereto attached and made part of this agreement.” The defendant
 
 “
 
 agrees to pay the party of the first part commissions on sales of said goods to be made, as follows; ” and this is succeeded by a schedule of varying rates of commission on enumerated classes of wares.
 
 “
 
 In consideration of the commissions hereinbefore provided to be paid by the party of the second part, the party of the first part agrees to guarantee the payment of all sales of goods made by him.” Every ninety days there is to be an adjustment of the commissions, to make them conform to the prescribed rates, which in some instances vary with market prices. The contract is signed by both parties. According to the defendant’s witness, the plaintiff was informed
 
 *189
 
 before its execution that any commissions due to him under it would be held back and applied in reduction of his indebtedness for the goods which he had bought. This the plaintiff denies, and no such privilege is reserved to the defendant in the written contract. The plaintiff had to pay his own rent, the wages of his own employees, and other expenses. The commissions were to be his sole reward; and if these were to be withheld until the debt of over $27,000 was wiped out, the plaintiff would have to work a long time before a dollar would be coming to him. By the middle of July, 1903, he had paid to the defendant on account of the old debt the sum of $5,249.58. If his testimony can he accepted, this is all that he then owed, the rest of the debt having been canceled in satisfaction of his losses. He had earned in commissions by that time about $4,000. He says that he then asked for the commissions, and was told that the defendant was applying them in reduction of the residue of his debt. The plaintiff proteste^, so he says, that the debt had been extinguished. By September 1, 1903, the commissions amounted to $6,447.19. Again the defendant refused to pay them, and, according to the plaintiff, refused to give him any orders. The plaintiff then stopped work and this action was begun. The trial judge dismissed the cause of action for damages upon the ground that the contract of April 1, 1903, though imposing on the plaintiff a duty to serve for five years, did not impose on the defendant a duty to employ him for a like period, The cause of action for commissions was submitted to the jury, who found a verdict for the plaintiff.
 

 The defendant’s appeal will be the first to be considered. It is urged, and we think correctly, that incompetent evidence was received to prove the extent of the plaintiff’s losses because of diverted trade. In the latter part of 1903, while this action was pending, the plaintiff and his bookkeeper made up a schedule intended to represent the loss of profits because of the alienation of cus
 
 *190
 
 tomers up to September, 1903. In the first column they placed the name of. the customer, in. the next the date when the last transaction with the customer occurred, and in the final column the amount of profit which the plaintiff estimated he would have made on September 1, ' 1903, if the customer had continued to deal with him. 1 Upon the plaintiff’s statement that this schedule correctly showed his loss of trade, and without other authentication, it was received in evidence. There was no proof of the extent or number of the sales which the plaintiff had made to any of the customers in the list. There was nothing beyond the fact that he had dealt with them, that the dealings had ceased, and that they told him that his unsatisfactory paint was the cause of their defection. Upon this he was permitted through the introduction of a schedule to testify to his conclusion that if they had continued to deal with him up to September 1 at the same rate he would have made in profits $14,624. The evidence was incompetent. The plaintiff did not place before the jury the volume of his business with each customer, and the circumstances tending to show the reason for the breaking off of their dealings. If that had been done, it may be that the jury from such premises might have reached a conclusion as to the resulting loss of profits. Instead of following that course, the plaintiff followed the reverse one. He should have proved the premises, and let the jury draw the conclusion. He proved the conclusion and withheld the premises. In effect, he stated his opinion as to the loss of profits resulting from diverted trade. That was the very question which the jury was to pass upon.
 
 (Roberts
 
 v. N.
 
 Y. Elev. R. R. Co.,
 
 128 N. Y. 455;
 
 Morehouse Mathews,
 
 2 N. Y. 514.)
 

 The plaintiff’s counsel, if we correctly understand his argument, concedes that this schedule is not competent to prove that the plaintiff did in fact lose the profits there stated. He says, however, that its true purpose was
 
 *191
 
 to prove the method of computation followed by the plaintiff, in stating to the defendant’s superintendent in March, 1903, that the losses had reduced the debt to $5,200. The evidence was not limited to that purpose, nor, if so limited, would it have been competent. The plaintiff stated to the defendant’s superintendent the gross figures only, and even the gross figures corresponded approximately and not exactly with those stated in the schedule prepared many months thereafter. If this schedule had been excluded there would have been no evidence before the jury to show the extent of the defendant’s losses. The conversation between the plaintiff and defendant’s superintendent in March, 1903, did not amount to an acceptance by the latter of the gross figures then stated by the plaintiff as constituting his claim. On the contrary, the plaintiff asked the superintendent what he was going to do about it, and could get no answer. The burden, therefore, rested on the plaintiff to show by competent evidence the loss which he had suffered. When defective goods are sold the measure of damages does not include the profits lost from the vendee’s failure to resell them unless such a loss is proved to have been within the contemplation of the parties.
 
 (Messmore
 
 v.
 
 N. Y. Shot & Lead Co.,
 
 40 N. Y. 422;
 
 Globe Refining Co.
 
 v.
 
 Landa Cotton Oil Co.,
 
 190 U. S. 540.) Still less does it include the loss of profits resulting from the alienation of the customers. We may assume that such losses would be recoverable if the vendor undertook to indemnify against them; but they ought to be proved with reasonable certainty.
 
 (Weinman
 
 v.
 
 de Palma,
 
 232 U. S. 571, 575;
 
 Schile
 
 v.
 
 Brokhahus,
 
 80 N. Y. 614, 620;
 
 Snow
 
 v.
 
 Pulitzer,
 
 142 N. Y. 263, 270;
 
 Bagley
 
 v.
 
 Smith,
 
 10 N. Y. 489.) The plaintiff failed to satisfy that requirement, and his verdict cannot stand.
 

 The plaintiff’s appeal from the dismissal of the second cause of action is next to be considered. The trial judge held that the contract imposed no obligation on the
 
 *192
 
 defendant to employ the plaintiff for five years, and that at the defendant’s option it was terminable, at will. We cannot accept that construction of its meaning. An intention to make so one-sided an agreement is not to be readily inferred.
 
 (Sanford
 
 v.
 
 Brown Brothers Co.,
 
 208 N. Y. 90.) The contract was drawn by the defendant’s lawyers and was tendered to the plaintiff with the assurance, as he says, that his future for the next five years would be secure. Since the language is the defendant’s we must construe it, if its meaning is doubtful, most favorably to the plaintiff.
 
 (Gillet
 
 v.
 
 Bank of America,
 
 160 N. Y. 549, 555;
 
 Marshall
 
 v.
 
 Com'l Tr. Mut. Acc. Assn.,
 
 170 N. Y. 434.) We must also give its words the meaning which the defendant ought reasonably to have understood that the plaintiff would put upon them.
 
 (White
 
 v.
 
 Hoyt,
 
 73
 
 N.
 
 Y. 505, 511;
 
 Nellis
 
 v.
 
 Western Life Indemnity Co.,
 
 207 N. Y. 320, 332, 334.) When these canons of construction are remembered and applied, we must conclude that the plaintiff believed and had the right to believe that the period of five years was to be the term of employment as well as the term of service. Looking at the writing tendered to him, he found that he was binding himself to sell for five years for and on account of the defendant certain paints,..oils and varnishes, a list of which was attached. He could not sell them unless the defendant furnished them. If he had any doubt as to the defendant’s duty to furnish them, it must have been dispelled by the words that followed: “The party of the second part hereby agrees to pay the party of the first part commissions on sales of said goods to be made, as follows.” The defendant did not merely accept the plaintiff’s promise to serve it for five years by the sale of its goods; it agreed to pay him commissions “ on sales of said goods,” and spoke of them as sales “to be made.” The plaintiff must have understood this as meaning that the defendant would do its part in permitting them “to be made.” It could not
 
 *193
 
 do that part unless it filled the orders which he reported. Note also that the writing in its opening words is described as an agreement, and that the engagements of each party are couched in terms of agreement, and not merely of promise. The plaintiff “ agrees ” to serve for five years. The defendant “agrees” to pay him at certain rates. The very word “ agreement ” connotes a mutual obligation. (Be
 
 nedict
 
 v.
 
 Pincus,
 
 191 N. Y. 377, 383, 384.) There may be a “promise” to serve without a promise to employ, but there can be no “ agreement ” for service without mutuality of rights and duties.
 
 (Richards
 
 v.
 
 Edick,
 
 17 Barb. 260, 263;
 
 Baldwin
 
 v.
 
 Humphrey,
 
 44 N. Y. 609, 615.) “If it be
 
 agreed
 
 between A and B that B shall pay A a sum of money for his lands, etc., on a particular day, these words amount to a covenant by A to convey the lands, for agreed is the word of both.”
 
 (Pordage
 
 v.
 
 Cole,
 
 1 Saund. 3191, quoted in
 
 Baldwin
 
 v.
 
 Humphrey, supra.)
 
 So, in
 
 Richards
 
 v.
 
 Edick (supra),
 
 where the covenant read: “The aforesaid party of the first part
 
 agrees
 
 to sell his farm in Florence, etc., to the party of the second part for and in consideration of seventeen hundred dollars,” the court held that the word “agreement” necessarily imported two parties, one to sell and one to buy. “It was not merely a
 
 promise
 
 made by one party to the other, but it was an
 
 agreement
 
 made by
 
 both
 
 and binding on
 
 both
 
 by every principle of law and morality applicable to the construction of contracts.”
 
 (Richards
 
 v.
 
 Edick, supra.)
 
 These words are equally applicable to the contract before us. Just as the plaintiff impliedly undertakes to serve at the rates which the defendant “ agrees ” to pay, so the defendant impliedly undertakes to accept for the designated term the service which the plaintiff “agrees” to render.
 

 The law, in construing the common speech of men, is not so nice in its judgments as the defendant’s argument assumes. It does not look for precise balance of phrase, promise matched against promise in perfect equilibrium.
 
 *194
 
 It does not seek such qualities even in written contracts, unless perhaps the most formal and deliberate, and least of all does it seek them where the words are chosen by the master under legal advice, and accepted by the servant without the aid of like instruction. There are times when reciprocal engagements do not fit each other like the parts of an indented deed, and yet the whole contract, as was said in
 
 McCall Co.
 
 v.
 
 Wright
 
 (133 App. Div. 62, 68), may be
 
 “
 
 instinct with * * * an obligation,” imperfectly expressed. If the defendant meant the plaintiff to understand that it had a right to discharge him at pleasure, it could easily have said so in words too clear for misconstruction. We think it did not say so, but by implication said the contrary. The law governing this subject was stated recently and with admirable lucidity by Vann, J., writing for this court, in
 
 Grossman
 
 v.
 
 Schenker
 
 (206 N. Y. 466). That case and others illustrating the same principle, justify the conclusion that the plaintiff’s obligation to serve and the defendant’s to employ were correlative and equal.
 
 (Jacquin
 
 v.
 
 Boutard,
 
 89 Hun, 437; affirmed on opinion below, 157 N. Y. 686;
 
 Baker Transfer Co.
 
 v. Merchants'
 
 R. & Ice Mfg. Co., 1
 
 App. Div. 507;
 
 Ellis
 
 v.
 
 Miller,
 
 164 N. Y. 434;
 
 City of N. Y.
 
 v.
 
 Paoli,
 
 202 N. Y. 18;
 
 Genet
 
 v.
 
 D. & H. C. Co.,
 
 167 N. Y. 608;
 
 Emmens
 
 v.
 
 Elderton,
 
 4 H. L. C. 624;
 
 Hudson Canal Co.
 
 v.
 
 Penn. Coal Co.,
 
 8 Wall, 276, 289.) The dismissal of the second cause of action was, therefore, error.
 

 The judgment should be reversed upon both appeals, and a new trial granted, without costs to either party.
 

 Willard Bartlett, Oh. J., Hiscock, Chase, Cuddeback and Hogan, JJ., concur; Miller, J., not sitting.
 

 Judgment reversed, etc.