(168 App. Div. 337)

### DIXEY v. A. H. WOODS PRODUCTIONS CO.   (No. 7355.)

(Supreme Court, Appellate Division, First Department.   June 18, 1915.)

1. MASTER AND SERVANT ☜80—CONTRACT OF EMPLOYMENT—WRONGFUL DISCHARGE—EVIDENCE.

In an action by an actor on a contract of employment for a specified period and compensation, evidence *held* to show that defendant discharged the actor without cause and refused to permit him to render the services he had agreed to render.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 107–127; Dec. Dig. ☜80.]

2. MASTER AND SERVANT ☜73—CONTRACT OF EMPLOYMENT—CONSTRUCTION—"WHEN SERVICES WERE RENDERED."

A contract between a theatrical manager and an actor recited that the manager was desirous of employing the actor for approximately 11 weeks, that the actor engaged to support an actress in a play during the period "at a salary of $600 per week for each and every week when services are rendered," and that the actor agreed to render services to the best of his ability for performances each week, without compensation for rehearsals, or for performances in which he did not actually render services, or for nonplaying nights. *Held*, that the contract, construed as a whole, evidenced a mutual, binding agreement between the parties for a definite period of 11 weeks, during which the actor was to render services for the manager, and the actor could recover compensation notwithstanding a wrongful discharge; the words "when services are rendered," in the quoted clause, being intended to mean no more than the due performance of the contract of employment by the actor.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 90–102; Dec. Dig. ☜73.]

3. MASTER AND SERVANT ☜3—CONTRACT OF EMPLOYMENT—CONSTRUCTION.

Where the intent of parties to make a mutually binding contract of employment for a definite term is plain, the court will not thwart it by any forced construction of the contract.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 2, 3; Dec. Dig. ☜3.]

Appeal from Trial Term, New York County.

Action by Henry E. Dixey against the A. H. Woods Productions Company. From a judgment for plaintiff, and from an order denying a new trial (88 Misc. Rep. 506, 151 N. Y. Supp. 224), defendant appeals. Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

William N. Cohen, of New York City, for appellant.
Samuel H. Wandell, of New York City, for respondent.

DOWLING, J.   Plaintiff and defendant on June 29, 1911, entered into a contract in writing whereby the former was to render services

for the latter as an actor, supporting Marguerite Sylva in a play
called "Gypsy Love" from the opening date, which was to be about
October 1, 1911, to, or about, December 6, 1911, at a weekly salary of
$600, and thereafter, and on or about December 23, 1911, defendant
was to star plaintiff in a play called "The Greyhound" (provided the
play proved satisfactory to the managers), and pay him for his serv-
ices 10 per cent. of the gross weekly receipts, guaranteeing that his
share should not be less than $600 per week. Both of these promises
to pay were followed by the words "when services are rendered."

Plaintiff rehearsed his part in "Gypsy Love" for four weeks, during
which time, pursuant to the terms of the contract, he received no sal-
ary. The production opened at the Forrest Theater, in Philadelphia,
on October 2, 1911. Woods, president of defendant, was present
thereat, and according to plaintiff told him that he (plaintiff) did not
have a very good part in the piece, and that Woods had brought on
another man, one McDonough, whom he proposed to put in the part,
as he did not think it was good enough for Dixey to appear in, in
New York; that he could get McDonough much cheaper, and would
rather pay Dixey while he was lying idle awaiting the production of
"The Greyhound." Woods expressed his fear that Dixey's appearance
in "Gypsy Love" might hurt his professional standing and injure his
availability from a business standpoint, to which Dixey replied that he
was ready and willing to play his part in "Gypsy Love" and did not
care about the consequences, and Woods replied, "No, I am going to
put this man into the rehearsal." McDonough then began to rehearse
the part, and did so continuously until he was assigned to take Dixey's
place regularly, beginning with the Wednesday matinée of the second
week of the play's run. Dixey, who was well acquainted with Mc-
Donough, was in the latter's dressing room, giving him instructions
as to his costumes, when Woods entered, and, saying that Miss Sylva
was ill and both stars could not be out of the play together, told Dixey
to go on for the matinée, which he did. McDonough made his first
appearance at the evening performance, continuously taking Dixey's
part thereafter.

Dixey remained in Philadelphia until the end of the week, and on
Saturday had a conversation with Woods, in which the former said
he was willing to remain idle, provided his salary for the remaining
11 weeks was paid preceding the opening of "The Greyhound," and the
latter said "that would be all right." But, when Dixey asked for
his salary that evening, the cashier said there were no salaries to be
paid, and he would see him in New York, but finally let him have $200.
When, after many efforts, Dixey succeeded in seeing Woods in New
York, the latter said it was "all a mistake," and requested him to
call again, when he told Dixey that since his last talk with him the
courts had decided that an actor could not get any salary while he was
lying idle, and therefore he refused to pay him. Dixey worked, in all,
one whole week and part of the second (down to and including the
Wednesday matinée). He remained idle throughout the remainder of
the 11 weeks for which he was employed to play in "Gypsy Love."
He was present at the Forrest Theater every night during the balance
of the week in Philadelphia, and when the play came to New York re-

ported at the Globe Theater to Slocum, defendant's representative, and was there every night while the show was playing. His total compensation under the "Gypsy Love" contract was to be $6,600, and he had been paid $1,300 in all by defendant, leaving a balance of $5,300, which, with interest, amounted to $6,254, for which sum the jury found in his favor. It appears that defendant never finally was satisfied with "The Greyhound," and did not in fact produce it, so that plaintiff made no claim for any salary under the second part of the contract, by which he was to be starred therein.

[1] Defendant sought to show by the testimony of Woods, its president, that Dixey had come to him after the opening of the play in Philadelphia and told him he had decided he would not open in New York with the play, because the part he had was a very bad one, and the critics there would "crucify" him; that Woods "begged" him to play in New York, but he persisted in his refusal, deeming the part he was playing so poor that it would injure him to be seen in it there. Woods testified that the salary paid to McDonough was either $150 or $200, and that he had communicated with McDonough about playing the part after Dixey told him he would not open in New York and that he had better get another man. He entirely denied Dixey's version of what occurred between them at their various interviews, and, so far from discharging Dixey, claimed that, even after McDonough was playing the part, he and Dixey saw the performance together, and he told Dixey he thought McDonough was very bad, and he would like to have Dixey open in New York, when Dixey again refused. At the close of his direct examination he said that he told Dixey to report every night at the New York Theater. Woods is sought to be corroborated by William S. Levine and Jacob J. Rosenthal, both connected with the "Gypsy Love" company. In rebuttal Dixey absolutely denied all their testimony as to his refusal to play in New York and as to Woods' insistence on his appearance there. The verdict of the jury that defendant, and not plaintiff, had breached the contract, we deem fully warranted by the evidence, which justified the finding that defendant had discharged the plaintiff without reason or cause, and refused to permit him to render the services he had agreed, and was ready and willing, to perform.

[2] Defendant, however, claims that no cause of action was established by plaintiff, because he was to be paid only for services rendered, and that although defendant, by discharging him and refusing to allow him to continue to act in his part, prevented him from rendering any services, it cannot be held to any liability therefor. We think that this is putting upon the contract in question a strained, unwarranted, and unnatural construction, and one which would work grievous injustice. The contract, so far as it is material to the question under discussion, recited that:

"Whereas, the said managers are engaged in the theatrical business as managers and producers, and are desirous of employing the said artist, for the time and upon the terms hereinafter contained; and whereas, the said artist possesses unique, special, and extraordinary qualities as an actor, and is desirous of being employed by and appearing under the management of the said managers for the time and upon the terms and conditions herein contained," the parties thereto agree:

"First. (a) That the said artist is hereby especially engaged and employed by the said managers to support Marguerita Sylva in a play entitled 'Gypsy Love,' from the opening of said attraction, which will be about October 1, 1911, to on or about December 16, 1911, at a salary of $600 per week, for each and every week when services are rendered. Said artist to be advertised as being especially engaged for 'Gypsy Love' on all advertising matter.

"Second. (a) Said artist does hereby agree to become engaged and employed by said managers, and to render services to the best of his skill and ability for the number of performances each week as shall be in accordance with the legal custom of all places of amusement in the various cities in which said artist is directed to appear, and at such theaters, opera houses, and other places of amusement, in the United States and Canada, as may be required by said managers, and to play the role assigned to him for the aforesaid compensation, with the terms and conditions herein provided. * * * (c) Said artist shall receive no compensation for rehearsals or for performances in which he does not actually render services, or for nonplaying nights during the term of this contract, which occur because of accident, or his sickness, public calamity, or from the act of God or the public enemy.

"Third. (a) Said managers and said artist further agree that the services of said artist to be performed for the said managers shall be unique, special, and extraordinary, and for the said reason, and in consideration of the terms of this contract, and for the further reason that the said artist possesses extraordinary ability as an actor, the said artist agrees that he will not render any services to any person or persons, firm, or corporation, during the term of this contract, except upon written consent of said managers first had and obtained."

Taken together, these provisions constitute a mutual, binding agreement between the parties for a definite period of 11 weeks, during which the artist is to render services for the manager, and for no one else without the latter's written consent. The artist obligates himself to perform services for the manager during the term of the contract; the manager obligates himself to pay the artist the stipulated salary during that term. But there are certain exceptions to the absolute right of the artist to receive salary during the term of the contract. They are specifically enumerated: (1) Services at rehearsals. In the case at bar the rehearsals occurred before the plaintiff's salary began to run. As to rehearsals subsequently had, this exception could only operate to bar extra compensation therefor. (2) Performances in which the artist does not actually render services, which occur because of his sickness or accident. While this may seem harsh, as punishing the actor for inability to render service, for which he is not responsible, it is not so when one considers the effect of his absence on the company, perhaps preventing a performance, or at least requiring the services of a substitute. But this very exception contemplates a case where the actor is expected by the manager to render services and does not do so. (3) Nonplaying nights, caused by public calamity or the act of God or the public enemy. This exception is justified by the interference with the manager's business by events both unexpected and of general concern, by which it would be unfair that the actor should profit, while his employer loses.

Read in conjunction with the paragraph marked "First. (a)," these provisions indicate that the words "when services are rendered" were intended by the parties to mean no more than the due performance of the contract of employment by the employed. If they are to be taken

literally, then the second and third exceptions quoted are meaningless and superfluous, for under the construction sought for by defendant the artist, by the very terms of the contract thus construed, would not be entitled to be paid anything when he failed to render services, no matter what the cause might be, whether produced by his agency, that of the defendant, or of a third party. We are therefore of the opinion that, when the defendant agreed to pay plaintiff for services rendered, the right to receive compensation was not limited to actual public appearances, but extended as well to so much of the contract period within which plaintiff was ready, willing, and able to perform the services contracted for, presented himself for the services required of him, and was prevented from rendering such services by the unlawful, arbitrary, and unjustifiable acts of the defendant.

[3] Nor can it be argued successfully that defendant had a right to terminate this period at will. Where the intent of the parties to make a mutually binding agreement of employment for a definite term is plain, the court will not interfere to thwart it by any forced construction of its terms. As was said in Moran v. Standard Oil Co., 211 N. Y. 187, 105 N. E. 217:

"Note, also, that the writing in its opening words is described as an agreement, and that the engagements of each party are couched in terms of agreement, and not merely of promise. The plaintiff 'agrees' to serve for five years. The defendant 'agrees' to pay him at certain rates. The very word 'agreement' connotes a mutual obligation. Benedict v. Pincus, 191 N. Y. 377, 383, 384 [84 N. E. 284]. There may be a 'promise' to serve without a promise to employ, but there can be no 'agreement' for service without mutuality of rights and duties. Richards v. Edick, 17 Barb. 260, 263; Baldwin v. Humphrey, 44 N. Y. 609, 615. * * * These words are equally applicable to the contract before us. Just as the plaintiff impliedly undertakes to serve at the rates which the defendant 'agrees' to pay, so the defendant impliedly undertakes to accept for the designated term the service which the plaintiff 'agrees' to render. * * * There are times when reciprocal engagements do not fit each other like the parts of an indented deed, and yet the whole contract, as was said in McCall Co. v. Wright, 133 App. Div. 62, 68 [117 N. Y. Supp. 775] may be 'instinct with * * * an obligation,' imperfectly expressed. If the defendant meant the plaintiff to understand that it had a right to discharge him at pleasure, it could easily have said so in words too clear for misconstruction. We think it did not say so, but by implication said the contrary."

We do not deem the decisions in Pollock v. Schubert Theatrical Co., 146 App. Div. 628, 131 N. Y. Supp. 386, and Plympton v. Liebler, 156 App. Div. 944, 142 N. Y. Supp. 1140, decisive of the questions here presented. In the former case the contract was to pay for each and every week when plaintiff "publicly appeared and performed," and not only did plaintiff there concededly not publicly appear and perform, but, as the court said:

"There is no allegation, or any fact pleaded from which such allegation can be inferred, to the effect that the defendant bound itself to give the plaintiff employment or permit him to appear or publicly perform for any specified time. It simply agreed it would pay him for such time as he 'publicly appeared and performed'; in other words, under the contract as pleaded, it was entirely optional with the defendant whether it would give the plaintiff actual employment or not, but, if it did, it was to pay him the compensation agreed upon, and there are no allegations in the complaint

to the effect that the plaintiff has not been fully paid for each and every week that he did appear and publicly perform. This being so, it seems to me a cause of action is not alleged."

In the case at bar the complaint alleges that the agreement between the parties was one—

"wherein and whereby the said defendant engaged and hired this plaintiff to work for it and render certain services as an actor, in connection with the production of a certain theatrical play known as 'Gypsy Love' for the term of 11 weeks beginning the 1st day of October, 1911, and ending the 16th day of December, 1911, and agreed to pay plaintiff therefor the sum of $600 weekly, and that this plaintiff agreed with defendant so to work and serve for the said time and for the said compensation."

In this construction of the legal effect of the contract we have already indicated our concurrence. Then follow appropriate allegations of plaintiff's rendition of services at rehearsals, due performance by him of all the conditions of the contract by him to be performed, and his wrongful discharge by the defendant, together with his readiness and willingness to carry out the agreement. The condition of both the pleading and the proof is thus quite different from the Pollock Case. Moreover, in that case the contract was radically different from the case at bar, and contained none of the provisions which in our opinion determine its construction. In the Plympton Case the contract much more nearly resembled the one under consideration, although there was there an agreement to pay only "while actually performing"; but we do not deem it determinative of the present appeal, the points of difference being sufficient to emphasize the greater mutuality of the present contract.

The judgment and order appealed from will therefore be affirmed, with costs. All concur.