I cannot take the view of this contract that has been adopted by the majority. The parties to this transaction beyond question thought they were making a contract for the purchase and sale of 16,000 tons rolls news print. The contract was upon a form used by the defendant in its business, and we must suppose that it was intended to be what it states to be, and not a trick or device to defraud merchants. It begins by saying that in consideration of the mutual covenants and agreements herein set forth the Remington Paper and Power Company, Incorporated, of Watertown, state of New York, hereinafter called the seller, agrees to sell and hereby does sell and the Sun Printing and Publishing Association of New York city, state of New York, hereinafter called the purchaser, agrees to buy and pay for and hereby does buy the following paper, 16,000 tons rolls news print. The sizes are then given. Shipment is to be at the rate of 1,000 tons per month to December, *Page 348 
1920, inclusive. There are details under the headings consignee, specifications, price and delivery, terms, miscellaneous, cores, claims, contingencies, cancellations.
Under the head of miscellaneous comes the following: "The price agreed upon between the parties hereto, for all papers shipped during the month of September, 1919, shall be $3.73¾ per hundred pounds gross weight of rolls on board cars at mills.
"The price agreed upon between the parties hereto for all shipments made during the months of October, November and December, 1919, shall be $4.00 per hundred pounds gross weight of rolls on board cars at mills.
"For the balance of the period of this agreement the price of the paper and length of terms for which such price shall apply shall be agreed upon by and between the parties hereto fifteen days prior to the expiration of each period for which the price and length of term thereof has been previously agreed upon, said price in no event to be higher than the contract price for newsprint charged by the Canadian Export Paper Company to the large consumers, the seller to receive the benefit of any differentials in freight rates.
"It is understood and agreed by the parties hereto that the tonnage specified herein is for use in the printing and publication of the various editions of the Daily and Sunday New York Sun, and any variation from this will be considered a breach of contract."
After the deliveries for September, October, November and December, 1919, the defendant refused to fix any price for the deliveries during the subsequent months, and refused to deliver any more paper. It has taken the position that this document was no contract, that it meant nothing, that it was formally executed for the purpose of permitting the defendant to furnish paper or not, as it pleased.
Surely these parties must have had in mind that some binding agreement was made for the sale and delivery of *Page 349 
16,000 tons rolls of paper, and that the instrument contained all the elements necessary to make a binding contract. It is a strain upon reason to imagine the paper house, the Remington Paper and Power Company, Incorporated, and the Sun Printing and Publishing Association, formally executing a contract drawn up upon the defendant's prepared form which was useless and amounted to nothing. We must, at least, start the examination of this agreement by believing that these intelligent parties intended to make a binding contract. If this be so, the court should spell out a binding contract, if it be possible.
I not only think it possible, but think the paper itself clearly states a contract recognized under all the rules at law. It is said that the one essential element of price is lacking; that the provision above quoted is an agreement to agree to a price, and that the defendant had the privilege of agreeing or not, as it pleased; that if it failed to agree to a price there was no standard by which to measure the amount the plaintiff would have to pay. The contract does state, however, just this very thing. Fifteen days before the first of January, 1920, the parties were to agree upon the price of the paper to be delivered thereafter, and the length of the period for which such price should apply. However, the price to be fixed was not "to be higher than the contract price for newsprint charged by the Canadian Export Paper Company to large consumers." Here surely was something definite. The 15th day of December arrived. The defendant refused to deliver. At that time there was a price for newsprint charged by the Canadian Export Paper Company. If the plaintiff offered to pay this price, which was the highest price the defendant could demand, the defendant was bound to deliver. This seems to be very clear.
But while all agree that the price on the 15th day of December could be fixed, the further objection is made that the period during which that price should continue was not agreed upon. There are many answers to this. *Page 350 
We have reason to believe that the parties supposed they were making a binding contract; that they had fixed the terms by which one was required to take and the other to deliver; that the Canadian Export Paper Company price was to be the highest that could be charged in any event. These things being so, the court should be very reluctant to permit a defendant to avoid its contract. (Wakeman v. Wheeler Wilson Mfg. Co., 101 N.Y. 205. )
On the 15th of the fourth month, the time when the price was to be fixed for subsequent deliveries, there was a price charged by the Canadian Export Paper Company to large consumers. As the defendant failed to agree upon a price, made no attempt to agree upon a price and deliberately broke its contract, it could readily be held to deliver the rest of the paper, a thousand rolls a month, at this Canadian price. There is nothing in the complaint which indicates that this is a fluctuating price, or that the price of paper as it was on December 15th was not the same for the remaining twelve months.
Or we can deal with this contract, month by month. The deliveries were to be made 1,000 tons per month. On December 15th 1,000 tons could have been demanded. The price charged by the Canadian Export Paper Company on the 15th of each month on and after December 15th, 1919, would be the price for the thousand ton delivery for that month.
Or again, the word as used in the miscellaneous provision quoted is not "price," but "contract price" — "in no event to be higher than the contract price." Contract implies a term or period and if the evidence should show that the Canadian contract price was for a certain period of weeks or months, then this period could be applied to the contract in question.
Failing any other alternative, the law should do here what it has done in so many other cases, apply the rule of reason and compel parties to contract in the light of fair dealing. It could hold this defendant to deliver *Page 351 
its paper as it agreed to do, and take for a price the Canadian Export Paper Company contract price for a period which is reasonable under all the circumstances and conditions as applied in the paper trade.
To let this defendant escape from its formal obligations when any one of these rulings as applied to this contract would give a practical and just result is to give the sanction of law to a deliberate breach. (Wood v. Duff-Gordon, 222 N.Y. 88; Moran
v. Standard Oil Co., 211 N.Y. 187; United States Rubber Co. v. Silverstein, 229 N.Y. 168.)
For these reasons I am for the affirmance of the courts below.
HISCOCK, Ch. J., POUND, McLAUGHLIN and ANDREWS, JJ., concur with CARDOZO, J.; CRANE, J., reads dissenting opinion with which HOGAN, J., concurs.
Order reversed, etc.