## BACH et al. v. FRIDEN CALCULATING MACH. CO., Inc., et al.

### No. 10098.

Circuit Court of Appeals, Sixth Circuit.

May 13, 1946.

Hugh McD. Ritchey and Joseph S. Graydon, both of Cincinnati, Ohio (Joseph S. Graydon, Joseph H. Head, and Hugh McD. Ritchey, all of Cincinnati, Ohio, on the brief), for appellants.

Carl M. Jacobs, of Cincinnati, Ohio, and Ashley M. Van Duzer, of Cleveland, Ohio (Carl M. Jacobs, of Cincinnati, Ohio, Ashley M. Van Duzer, of Cleveland, Ohio, Carl Phares and Smith Warder, all of Cincinnati, Ohio, on the brief), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The corporate appellee is a manufacturer of calculating machines and the appellants were its distributors in the Cincinnati area from June 13, 1935 until on May 15, 1944 the manufacturer undertook to dissolve the arrangement and appoint appellee Gunderson as its distributor in the territory. Appellants promptly sued to restrain interference with their franchise. Permanent injunction was denied and the cause dismissed. An earlier appeal was remanded for findings of fact, 148 F.2d 407. After making such findings and announcing conclusions of law, the district court again dismissed the cause upon its merits, and this appeal followed.

Appellants were partners in the sale and repair of accounting machines, when in 1943 they learned of the Friden calculator which had just been put upon the market. The Cincinnati territory was occupied by Gaylord from whom they secured a subagency and from whom they obtained replacement parts. In May, 1935, Gaylord decided to make no more purchases from Friden until imperfections in machines already purchased were corrected, and in June of that year, Lund, Friden's general manager, negotiated with the appellants for taking over the Cincinnati distributorship directly. They reviewed in detail a sales plan under which it was proposed that they operate. The plan provided that machines were to be sold to distributors at list prices less 50% discount, the distributor to do the servicing with repair parts furnished by Friden during the guarantee period, and Friden furnishing national advertising. The sales plan contained the following provision:

"Sales Organization: Exclusive sale franchises will be assigned to Distributors upon a basis that will enable them to create

for themselves an Independent Business that should not only be profitable, but permanent as well."

There was also a provision that in case of termination of the distributorship the factory reserved the option of taking over the inventory at 50% of list prices for new or unsold equipment, and a representation that the sales plan enables every distributor an opportunity to establish himself in his own business with a freedom and independence impossible when employed by a branch office organization.

Bach testified that after going over the plan Lund said to him, "On this plan, we can't nor nobody else can check you out; this is yours individually as long as you live and do a good job right through." The appellants were willing to take over the Cincinnati territory. Lund, however, insisted upon their purchase of the machines which they had on consignment from Gaylord. The appellants demurred on the ground the machines were old and mechanically imperfect. Lund would consider no compromise, however, and the appellants finally agreed. On June 13, 1935, at a meeting arranged by Lund in Louisville, they paid Gaylord $2350 for the machines. Promptly the appellants began the development of the Cincinnati distributorship in territory which included besides Cincinnati, 8 counties in Ohio, 3 in Kentucky and 2 in Indiana. The assignment of territory was confirmed in writing by Lund, and in a letter from Friden, the manufacturer's president, the hope was expressed that the association would of long standing and mutually beneficial.

The appellants built up their sales organization and operated without incident until October, 1941. Their business grew from a volume of a little more than $23,000 in 1935, to a volume of over $80,000 in 1941, and the percentage of Friden business to their total business grew from 14.6% to a peak of 80%.

In October, 1941, the Federal Excise Tax went into effect, and Friden, fearing the possibility of double taxation, felt that it was necessary for the factory to do the billing, that the appellants should no longer buy their inventory outright, and that the

commission should be reduced from 50 to 40% in view of the reduction in necessary bookkeeping and capital outlay on the part of the distributors. However, before any machines had been sold under the new arrangement, Friden revised its views and agreed that the business should be conducted on the original basis. In March, 1942, however, the War Production Board issued Order No. L-54-B, restricting the manufacture of calculating machines and the filling of orders except on certificate of the WPB. It was again agreed in September of 1942, that the Friden Company should do the billing so as to comply with the limitation order. In all other respects the distributors continued to operate the business as they always had. In March, 1944, the appellants received from Friden a document entitled "Sales Agent's Agreement," and at a distributors' meeting in Cleveland they were asked to sign it. The agreement was a comprehensive outline of manufacturer-distributor relationship, and provided that it could be canceled and the distributorship terminated by either party after one year on 90 days written notice. The appellants declined to execute the proposed agreement, and on May 15, 1944, were notified that effective June 15 they would no longer represent Friden, and on that date Gunderson appeared at their office and advised them that he was taking over.

When the appellants filed their suit on June 16, they obtained a temporary restraining order, but in July, when the case was heard, this order was dissolved and judgment entered for Friden and Gunderson. The court based decision on the ground that the contract was without consideration, lacked mutuality so long as it remained executory, that the arrangement was neither perpetual nor for the lives of the plaintiffs, that it was terminable at the will of either party and was rightfully terminated by Friden. The court further concluded that Lund had no authority to make any arrangement other than that contained in the sales plan, that in any event the arrangement was terminated by the agreement of October 21, 1941, that the operation of government orders had made the contract impossible of performance, that the plaintiffs had an adequate remedy at law,

and finally that the contract was too indefinite to be supervised by a court of equity.

■ There is no substantial factual controversy since the motion to dismiss was made and granted at the conclusion of the plaintiffs' evidence. In this situation the evidence must, under familiar rules, be considered in the light most favorable to them. Insofar as findings of fact are based upon inference, a reviewing court remains free to draw the ultimate inferences and conclusions which evidentiary findings reasonably induce. Harris Stanley Coal & Land Co. v. Chesapeake & Ohio R. Co., 6 Cir., 154 F.2d 450; Letcher County et al. v. De Foe, 6 Cir., 151 F.2d 987; Globe-Union, Inc., v. Chicago Tel. Supply Co., 7 Cir., 103 F.2d 722; Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 119 F.2d 704. Insofar as the court undertook to determine the existence or validity of the alleged contract, whether in findings of fact or conclusions of law, it involves legal determinations which we ourselves are competent to make and may do so notwithstanding Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A. following section 723c.

■ Whatever the contract, it was based upon a valid consideration. In order to obtain the distributorship the appellants were required to buy an inventory of obsolete machines in bad state of repair, which they did not want and could not use. While the consideration passed to Gaylord it was at the insistence of Friden, and relieved Friden of any responsibility it may have felt to Gaylord in respect to such machines. The case, therefore, is to be distinguished from Curtiss Candy Co. v. Silberman, 6 Cir., 45 F.2d 451, where an initial order for merchandise was given in pursuance of a contract and not as an inducement to its execution, and so was construed as a separate and independent sale.

■ There was no lack of mutuality in the arrangement between the parties. Uncertainty as to the number of machines to be ordered by the solicitor was of the very nature of the contract and capable of ascertainment after performance. Falstaff Brewing Co. v. Iowa Fruit & Produce Co., 8 Cir., 112 F.2d 101. It has now long been

held by courts of highest repute, that the lack of specific obligation by one of the parties to a contract will not invalidate it where the whole contract may be instinct with obligation even though imperfectly expressed. Moran v. Standard Oil Co., 211 N. Y. 187, 197, 105 N.E. 217; Wood v. Lucy, Lady Duff-Gordon, 222 N. Y. 88, 90, 118 N.E. 214; Edison Electric Illuminating Co. of Brooklyn v. Thacher, 229 N. Y. 172, 178, 128 N.E. 124. As was said by Professor Corbin in, "Cardozo on the Law of Contracts," 52 Harvard Law Review 446, "The meaning that will determine legal effect is that which is arrived at by objective standards; one is bound, not by what he subjectively intends, but by what he leads others reasonably to think that he intends." This line of authorities has been consistently followed in this court. Globe Steel Abrasive Co. v. National Metal Abrasive Co., 6 Cir., 101 F.2d 489; Crossland v. Kentucky Blue Grass Seed Growers' Co-op. Ass'n, 6 Cir., 103 F.2d 565; Remington-Rand Business Service, Inc., v. Walter J. Peterson Co., 6 Cir., 58 F.2d 11; Ken-Rad Corp. v. R. C. Bohannan, Inc., 6 Cir., 80 F.2d 251. The Ohio rule is not contra, at least, when there is consideration. Fuchs v. United Motor Stage Co., 135 Ohio St. 509, 21 N.E.2d 669.

■■ The contract was not one terminable at the will of Friden. Certainly by its terms and all attendant circumstances, it was construed by both parties as having a large degree of permanence. The distributors were to build up a business of their own and be independent purveyors of Friden machines. Certainly it was not contemplated that after the payment by the appellants to Gaylord of $2350, the expenditure of effort and the incurring of promotion expense, Friden could at any time it saw fit terminate the distributorship. Where the duration of a contract is indefinite the general rule is that the contract is to be performed within a reasonable time. Crossland v. Kentucky Blue Grass Seed Growers' Co-op. Ass'n, supra; 1 Restatement, Contracts, 53; Producers' Live Stock Marketing Ass'n, 256 Ky. 196, 75 S.W.2d 1075, 100 A.L.R. 828. What constitutes a reasonable time presents an issue of fact to be arrived at upon a consideration of all of the circumstances attending its execution and performance.

When it comes to a determination of the duration of the agreement, the case is a close one. The appellants contend the agreement was to continue during their lifetime, or at least during such time as they continued to devote their best efforts to the promotion and sale of the Friden calculator. On the other hand, it is argued that a perpetual franchise or a franchise for the life of one of the obligated parties, is so unusual that it may not be adjudged as such except upon very clear and convincing evidence; that Lund's observation that the distributorship belonged to the appellants as long as they lived and did a good job, fell far short of qualifying as such evidence, and in any event was a mere "puffing" statement. For reasons presently to be considered, we need not determine whether the court was right or wrong in concluding that the contract was not for definite duration.

For the same reasons we do not undertake to determine whether the appellants had already been permitted a reasonable time for performance. An agency or distributorship which necessitates perfecting an organization and investing capital, contemplates a measure of continuity, yet were the case remanded to the district court for determination whether the appellants had been given a reasonable time for performance, the years between 1935 and 1944 might well have seemed to a court of equity to meet the test of reasonableness. On the other hand, the appellants had carried on through years of depression and years of war, and during curtailment of manufacture by government order. It might be concluded that in these circumstances it was not, in good conscience, reasonable to deprive them of the opportunity of reaping the benefits for a period of an expanding business era generally expected to follow the end of the war. Were it necessary to decision, we probably should find little difficulty in determining that the agreement in September, 1942, whereby the billing was to be done by Friden rather than by appellants with a change in the

rate of commission, was an amendment of the original contract in some of its terms, rather than its substitution by a new agreement. We should also find little difficulty in rejecting the contention that the agreement became impossible of performance by reason of the orders of the War Production Board. While they curtailed operations under the contract, they did not terminate them, and it may be assumed that the servicing of machines and replacement of their worn or broken parts, continued to be an important phase of the business, as in the case of other mechanical devices.

■ When we come to consider the efficacy of equity to grant relief, we meet our greatest difficulty. It has been the rule that equity will not grant specific performance of a contract so indefinite in its terms as to require continuous policing of performance and when obedience to a decree may not be compelled by ordinary court processes. The doctrine has been liberalized so that a negative injunction will issue on behalf of a principal against an agent or an employer against an employee where the contract is breached by the agent or the employee. This does not require the supervision of a court. In such cases as Lumley v. Wagner, 1 DeGex, M. & G. 604; Philadelphia Ball Club, Ltd., v. Lajoie, 202 Pa. 210, 51 A. 973, 58 L.R.A. 227, 90 Am.St.Rep. 627; Shubert Theatrical Co. v. Rath, 2 Cir., 271 F. 827, the obligation of the principal or employer is limited to the payment of salary, easily compelled by decree, and restraint of the employee, preventing his service to others during the life of the contract is similarly capable of enforcement, by negative injunction, though he will not be restored to his position. Engemoen v. Rea, 8 Cir., 26 F.2d 576. But as pointed out by Judge Learned Hand in Bethlehem Engineering Export Co. v. Christie, 2 Cir., 105 F.2d 933, 125 A.L.R.

1441, where the continuance of an injunction depends upon the continuance of the defendants' obligation to the plaintiff, and the continuance of that obligation in turn depends upon the plaintiffs' continued performance of its duties under the contract, and these obligations are inter-dependent and would involve constant scrutiny, every reason which makes specific performance impracticable applies equally to a purely negative injunction.

■ An appropriate decree in the instant case, whether granting an injunction during the life of the distributors or for a period ascertained to be reasonable, would necessarily condition the duration of restraint upon the defendant continuing in the manufacture of calculating machines and would require it to supply the distributors either according to their needs or with their equitable proportion of the manufacturer's product if restricted. It would be conditioned also upon the distributors continuing to devote their best efforts to the distribution of the Friden machines in the area assigned. These interwoven obligations remain uncertain in the contract and the necessary result of such decree would be the continued policing of the conduct of the parties, both in respect to the operations of the manufacturer and those of the distributors—a task for which courts are not equipped and which is incapable of compulsion by usual judicial process. Concededly, Judge Hand's reasoning may not be in accord with Singer Sewing Machine Co. v. Union Buttonhole Embroidery Co., Fed. Cas.No. 12,904, and Brush-Swan Electric Light Co. v. Brush Electric Co., C. C., 41 F. 163, but it commends itself to us and we follow it.

The decree is affirmed, without prejudice to pursuit of legal remedies for breach of contract.

It is so ordered.