Fuchsberg, J.
(concurring). This appeal, directly involving the interpretation of the language of an insurance policy, presents us with an opportunity to provide much-needed clarification of the confusion which now so frequently attends the construction of such contracts. In the hope that it will prove useful on that score, I therefore venture to set out the views on which I base my vote.
The case comes to us in the context of a suit brought by the plaintiff, Loblaw, Inc., a retail chain, under a “workmen’s compensation excess insurance policy” issued to it by the defendant, Employers’ Liability Assurance Corporation. By its terms, Employers’ agreed to reimburse Loblaw for any amounts beyond $25,000 which the latter might be required to pay for any one accident; Loblaw qualified as a self-insurer for the $25,000 retention (Workmen’s Compensation Law, § 50* cf. Vehicle and Traffic Law, § 316 [liability “self insurance”]).
The pivotal question is whether Loblaw complied with the excess policy’s notice provision. In pertinent part, it reads: “The Self-Insurer, upon the occurrence of any accident which in the opinion of the Self-Insurer may involve liability on the part of the Company shall give immediate written notice thereof, with the fullest information obtainable at the time, to * * * the Company * * * The Self-Insurer shall give like notice with full particulars on any claim made or suit brought on account of such accident”.
Relevant too is the policy’s prescription that: “The Self-Insurer shall assume charge of the settlement or defense of any claim made or proceeding instituted against the Self-Insurer but the Company shall be given the opportunity and shall have the right, to be exercised at its own election and at its own expense, to be associated with the Self-Insurer in the defense and control of any claim or suit or proceeding relative to any accident where in the opinion of the Company there is a possibility of the loss exceeding the amount to be borne by the Self-Insurer”.
These clauses before us, we turn to the events governing this litigation, both those relating to the underlying com *875 pensation claim from which it emanates and those bearing directly on whether the notice necessary to implicate the excess coverage was given.
It all starts with an accident on February 24,1964, when a Loblaw employee, then in apparent good health, sustained a work-related back injury. It is undisputed that while, as first reported, the injury was relatively slight, over the next 14 months it took a troublesome course which led to three hospitalizations, one for back surgery, whose aftermath, according to a medical evaluation commissioned by Loblaw in April, 1966, was permanent partial disability. Concomitantly, an appraisal of the financial exposure the employee’s compensation claim then represented, made for Loblaw by the licensed insurance adjusting company which acted as its agent in such matters, advised it that the claim “can prove very expensive because here we have a fairly young man and this can go on forever”.
Up to this point, Loblaw had given no notice of the occurrence to Employers’. Nor did it do so when, on September 28, 1967, the agent advised Loblaw that a reserve of $31,500 was warranted. Indeed, though reports of intervening medical examinations produced equally pessimistic prognoses, the matter remained unreported to the excess carrier as late as December, 1970, when the agent not only drew its principal’s attention to the fact that the latter already had paid out $21,061.04 against this open-ended claim, but also politely, but expressly, suggested that it “might wish to contact the excess carrier”. Nevertheless, as is now conceded, it was not until June 20,1972 that notice was despatched to Employers’. The latter’s response, in July, was in the form of a letter reserving the right to disclaim, and, in October after investigation, the exercise of that purported right on the ground that its insured failed to timely comply with the notice clause. There followed this suit, for a declaration of rights and for all payments due under the policy.
After a nonjury trial, Supreme Court, Erie County, held, explicitly that, until “shortly” before it advised Employers’ of the ongoing claim, Loblaw entertained a genuine opinion that the claim “was not likely to exceed the retention *876 figure” and, implicitly, that, so long as Loblaw held that opinion, no matter its subjectivity, no notice was required. On that rationale, the court entered an order (1) directing Equitable to reimburse Loblaw for $21,751.64, the sum by which the $25,000 retention had by then been exceeded, and (2) declaring that Employers’ was obligated as well to reimburse Loblaw for all future medical and compensation payments on account of this claim.
On appeal, however, the Appellate Division, Fourth Department, held, first, that Loblaw’s obligation under the agreement was not so limited but an ongoing one and, second, that, by May, 1969, it surely was derelict in not notifying Employers’. In reaching this second conclusion, it placed specific reliance on (1) medical diagnoses which, as of that date, well over five years after the accident, continued to certify the permanent nature of the claimant’s disabling injury, (2) on the $14,000 which the steadily mounting compensation payments then had already réached, and (3) on the fact that the 55-year-old claimant (who under the life expectancy tables of the United States National Center for Health Statistics had a life expectancy of 20.8 years [NY PJI2d, 1981 Cum Supp, p 225]) had many compensable years ahead of him. Accordingly, the court reversed the order from which the appeal was taken and, on the facts and on the law, dismissed the complaint. I agree that we should uphold this result, but on the ensuing analysis.
To that end, at the outset I observe that, judicial statements to the contrary notwithstanding, the interpretative principles applicable to a contract of insurance generally are indistinguishable from those to which courts may resort in treating with other contracts (e.g., Molycorp, Inc. v Aetna Cas. & Sur. Co., 78 AD2d 510). Therefore, absent an ambiguity admitting of extrinsic proof, and none was tendered here, its construction presents an issue of law to be decided by the court from its consideration of the policy itself, including those factual elements which may be said to be integral to it (Sutton v East Riv. Sav. Bank, 55 NY2d 550, 554-555; Hartford Acc. & Ind. Co. v Wesolowski, 33 NY2d 169, 172; Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 291).
*877 Thus, while courts, given the fact that in most instances insurance policies are drawn unilaterally by their issuers, have frequent occasion to say that such an agreement is to be construed strictly in favor of the insured and against the insurer (e.g., Breed v Insurance Co. of North Amer., 46 NY2d 351, 353), this is no more than to restate, in an insurance milieu, the long-established proposition that a contract’s residual doubts or ambiguities are to be resolved against the party who prepared it (Evelyn Bldg. Corp. v City of New York, 257 NY 501, 513; Moran v Standard Oil Co., 211 NY 187, 196). The corollary, of course, then must be that, when the meaning of an insurance contract is plain and clear, not only are all parties including the insurer who supplied it, entitled to have it enforced according to its terms (Government Employees Ins. Co. v Kligler, 42 NY2d 863), but this entitlement is not to be subverted by straining to find an ambiguity which otherwise might not be thought to exist (1 Couch’s Cyclopedia of Insurance Law [2d ed], § 15:85; 13 Appleman, Insurance Law & Practice, §§ 7401-7402). So, if the only reasonable construction is one favorable to the insurer-drafter of the agreement, there should be no reluctance to follow it (Hollander v Nationwide Mut. Ins. Co., 60 AD2d 380, 384, mot for lv to app den 44 NY2d 646).
On the other hand, when there is ambiguity, the status of the party who authored the policy is not to be confused with that of a party who happens to be an insurer but issued no policy or of one in a position like that of Loblaw, who was merely a self-insurer.
It must be remembered however that Loblaw claimed no ambiguity. It follows that its contention that the policy nevertheless was to be read in its favor simply because it was the product of Employers’ draftsmanship is unconvincing. For Loblaw urges us to hold that the word “upon” in the “upon the occurrence of any accident” phrase of the notice clause be read so literally that the excess carrier’s coverage would be involved only “immediately after the occurrence took place or the claim was brought”. Since the injury, when it occurred, did not appear to be a serious or lasting one, so narrow a construction would compel us to hold that Loblaw, justifiably arriving at a negative opinion *878 at that early stage, was relieved of any future obligation to give notice, no matter how large the claim later might turn out to be.
But in construing an agreement, whether it is facially clear is not the be all of things. The broader aim is “a practical interpretation of the expressions of the parties [so] that there be a ‘realization of [their] reasonable expectations’ (1 Corbin, Contracts, § 1)” (Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d 397, 400; see, also, 4 Williston, Contracts [3d ed], § 600, pp 284-285). To achieve this purpose, all the more so when the focus, as here, is on a particular provision, it hardly needs saying that the writing must be viewed in its totality (Fleischman v Furgueson, 223 NY 235, 239; Restatement, Contracts 2d, § 202, subd [2]). Moreover, a court must look for the meaning of the writing to “parties of the kind” who contracted it, bearing in mind the “interests” it was intended to further (4 Williston, op. cit., § 607, p 378; see Restatement, Contracts 2d, § 202, subd [1]).
So measured, it cannot be doubted but that Employers’, in conditioning its risk on Loblaw’s agreement to the notice provision, was serving its “interests”, among other things, in setting appropriate reserves and in protecting itself against the possibility of fraud or other abuse by timely investigation (see Security Mut. Ins. Co. of N. Y. v Acker-Fitzsimons Corp., 31 NY2d 436, 440; Utica Sanitary Milk Co. v Casualty Co. of Amer., 210 NY 399, 403). That these objectives were within the contemplation of “parties of the kind” we have here, one an insurance company and the other a supermarket chain operator, who, in the handling of the claims it reserved to itself as a self-insurer, presumably was alert to the self-evident problems stale claims could pose.
Furthermore, when one examines the rest of the agreement, the existence of this concern is all the clearer. The separate clause, by which Employers’ expressly reserved the “right * * * to be associated with the Self-Insurer in the defense and control of any claim” raising even a “possibility” that its cost would transgress excess limits, hardly envisions a passive role, dependent on the subjective judgment of Loblaw alone. Surely given the inexactness of *879 medical science, the word “possibility” imposed an obligation to give notice when Loblaw knew or, by an objective standard, reasonably should have known that excess coverage would be involved. Also, when, by this standard, the facts prevailing at the time of the claim, or thereafter, did not warrant giving such notice, Loblaw still had to meet what I construe to be an ongoing obligation to do so if and when changed conditions did so warrant. Otherwise, unless an accident was undeniably catastrophic or near-catastrophic from the beginning, for all practical purposes the notice clause would be reduced to meaninglessness, a legally disfavored result (see Theatre Guild Prods. v Insurance Corp. of Ireland, 25 AD2d 109, 111, affd 19 NY2d 656).
It therefore cannot be said that the Appellate Division erred when it held, as a matter of law, that Loblaw had an ongoing obligation to give notice of claims which, reasonably, might involve Employers’ coverage. But it is unnecessary to pass on whether, either on the law or on the facts, Loblaw’s failure to give such notice by May, 1969 was a breach of this condition. Suffice it to say that, on the equally uncontested facts existing on December 20, 1970, when the $14,000 which had been expended by May, 1969 had reached over $21,000, the notice it despatched on June 20, 1972 was too late as a matter of law.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler and Meyer concur; Judge Fuchsberg concurs in a concurring opinion; Judge Gabrielli taking no part.
Order affirmed, with costs, in a memorandum.

 When the policy issued what is now known as the “Workers’ Compensation Law” was still called the “Workmen’s Compensation Law” (L 1978, ch 79, § 1).