**McKINLEY ASSOCIATES, LLC, Plaintiff,**

v.

**McKESSON HBOC, INC., Defendant.**

**No. 99–CV–398A.**

United States District Court, W.D. New York.

June 26, 2000.

Saperston & Day, P.C., Thomas F. Knab, of counsel, Buffalo, NY, for Plaintiff.

Nixon, Peabody, LLP, Vivian M. Quinn, of counsel, Buffalo, NY, for Defendant.

ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio pursuant to 28 U.S.C. § 636(b)(1), on July 22, 1999. On June 16, 1999, defendant filed a motion to dismiss or, alternatively, for summary judgment and on September 3, 1999, plaintiff filed a cross-motion for summary judgment. On May 30, 2000, Magistrate Judge Foschio filed a Report and Recommendation, recommending that defendant's motion to dismiss and alternatively, for summary judgment should be granted; and plaintiff's cross-motion for summary judgment should be denied.

Plaintiff filed objections to the Report and Recommendation on June 19, 2000 and oral argument on the objections was held on August 21, 2000.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's thorough and well-reasoned Report and Recommendation, defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied. The Court also grants defendant's motion for attorneys' fees. The case is hereby referred back to Magistrate Judge Foschio, pursuant to 28 U.S.C. § 636(b)(3) and Federal Rules of Civil Procedure 54(d)(2)(D) and 72(b), for a report and recommendation on the proper amount of attorneys' fees to be awarded.

IT IS SO ORDERED.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This case was referred to the undersigned by the Honorable Richard J. Arcara on July 22, 1999, for report and recommendation on all dispositive motions. The matter is presently before the court on Defendant's motion to dismiss or, alternatively, for summary judgment filed June 16, 1999 (Docket Item No. 2), and on Plaintiff's cross-motion for summary judgment filed September 3, 1999 (Docket Item No. 10).

### *BACKGROUND*

Plaintiff, McKinley Associates, LLC, commenced this action on May 6, 1999, in New York Supreme Court, Erie County, alleging two New York common law causes of action including for money had and received and for conversion. On June 11, 1999, Defendant, McKesson HBOC, Inc., formerly known as McKesson Corporation, pursuant to 28 U.S.C. § 1446(a), removed the action to this court on the basis of diversity jurisdiction.

On June 16, 1999, McKesson filed a motion to dismiss or, alternatively, for summary judgment. (Docket Item No. 2). Defendant's motion was supported by an Affidavit of James G. Law ("Law Affidavit"), a Memorandum of Law (Docket Item No. 3) ("Defendant's Memorandum"), and a Statement of Undisputed Facts Pursuant to Local Rule 56 (Docket Item No. 4) ("Defendant's Fact Statement").

Plaintiff, on September 3, 1999, filed a Cross–Motion for Summary Judgment. (Docket Item No. 10). In support of the cross-motion, Plaintiff filed a Counter–Statement of Undisputed Facts in Support of Cross–Motion for Summary Judgment Pursuant to Local Rule 56 (Docket Item No. 11) ("Plaintiff's Fact Statement"), the Affidavit of James L. Soos (Docket Item

No. 12) ("Soos Affidavit"), the Affirmation of Thomas F. Knab, Esq. (Docket Item No. 13) ("Knab Affirmation"), and a Memorandum of Law (Docket Item No. 14) ("Plaintiff's Memorandum").

On October 1, 1999, in response to Plaintiff's cross-motion for summary judgment and in further support of Defendant's motion to dismiss or for summary judgment, Defendant filed a Memorandum of Law (Docket Item No. 16) ("Defendant's Response/Reply Memorandum"), the Reply Affidavit of James G. Law (Docket Item No. 17) ("Law Reply Affidavit"), and the Affidavit of Thomas E. Reidy (Docket Item No. 18) ("Reidy Affidavit").

Defendant filed, also on October 1, 1999, a Reply to Plaintiff's Counter–Statement of Undisputed Facts Pursuant to Local Rule 56 (Docket Item No. 19) ("Defendant's Reply to Plaintiff's Fact Statement"). On October 12, 1999, Defendant filed a Reply Memorandum (Docket Item No. 20) ("Defendant's Reply Memorandum"). Oral argument was deemed unnecessary.

For the following reasons, Defendant's motion (Docket Item No. 2) to dismiss should be GRANTED and, alternatively, for summary judgment should be GRANTED; Plaintiff's cross-motion for summary judgment (Docket Item No. 10) should be DENIED. However, should the District Judge deny Defendant's motion to dismiss and for summary judgment, summary judgment in favor of Plaintiff should not be entered as Defendant must be permitted an opportunity to serve, within 10 days of the District Judge's decision, an answer asserting counterclaims, as provided for under Fed.R.Civ.P. 12(a)(4)(A).

### *FACTS* [1]

Plaintiff, McKinley Associates, LLC ("McKinley") is an affiliate of Pyramid Management Group, Inc. ("Pyramid"), the management company for several shop-

---

1. Taken from the pleadings and motion pa- pers filed in this action.

ping centers in the Northeast United States, including the Walden Galleria Mall ("the Walden Galleria"), located in Cheektowaga, New York. McKinley is also the owner of commercial property located at 100 McKesson Parkway, Cheektowaga, New York ("the leased premises"), which is adjacent to the northern edge of the property on which the Walden Galleria is located. A 90,000–square foot warehouse facility is located on the leased premises ("the warehouse"). Defendant, McKesson HBOC, Inc., formerly known as McKesson Corporation ("McKesson"), is engaged in the business of the wholesale distribution of pharmaceuticals and over-the-counter products sold in drug stores.

Pursuant to a 25–year lease executed on December 2, 1968 ("the Lease"), McKesson's predecessor-in-interest, Foremost–McKesson, Inc., leased the premises from McKinley's predecessor-in-interest, Yattendon Corp.[2] The Lease required McKesson to make monthly rent payments ("Base Rent") and to pay the real property taxes on the leased premises. McKesson then commenced using the warehouse as a wholesale distribution center for a wide variety of its products.

Paragraph 5 of the lease provides that, as the lessee, McKesson was entitled to use of the leased premises, including the warehouse, for an interim term commencing on December 17, 1968 and ending on December 31, 1968, as well as for the primary term commencing on January 1, 1969 and ending on December 31, 1993. Upon the expiration of the primary term, McKesson had the option of extending the lease for six consecutive 5–year terms, with a potential final expiration date of December 31, 2023. The lease also provides McKesson with the right to assign and sublet the leased premises. Pursuant to a Lease Modification Agreement ("the Modification Agreement") executed on

September 27, 1988, a portion of the leased premises was released from the lease and replaced with a new parcel of land, but the remaining Lease terms were undisturbed.[3]

Prior to the expiration of the primary term of the Lease on December 31, 1993, McKesson exercised the first of its six consecutive 5–year extension options, thereby extending the Lease to December 31, 1998. In early 1998, James G. Law, then McKesson's Vice President for Corporate Real Estate, was contacted by James L. Soos, Walden Galleria's General Manager and a representative of both Pyramid and McKinley. Soos informed Law that McKinley had recently acquired a fee interest in the leased premises, and desired to buy out the Lease and demolish the warehouse as Pyramid then intended to expand the Walden Galleria. Law informed Soos that McKesson had intended to exercise its remaining options to extend the Lease for the foreseeable future as the Lease's terms were very favorable to McKesson. For example, in 1998, McKesson's annual rent payments were $18,524 and were expected to decrease to $14,820 in 1999. However, Law informed Soos that McKesson would consider McKinley's offer to buy out McKesson's interest in the Lease. Soos later presented Law with McKinley's offer of $2 million which McKesson rejected. Law advised Soos that McKesson was unwilling to terminate the Lease for less than $7 million. The parties eventually agreed that McKesson would sell to McKinney its interest in the Lease for $5 million.

Accordingly, on June 22, 1998 ("the Effective Date"), McKinley and McKesson executed the Lease Termination Agreement ("the Lease Termination Agreement" or "the Agreement"), requiring McKinley to pay McKesson $5 million as consideration for McKesson's termination of the

2. A copy of the Lease is attached as Exhibit A to Law Affidavit.

3. Although not specifically stated in the papers, there is no indication in the record that

any part of the warehouse was located on the portion of the leased premises released by the Modification Agreement.

Lease, including the five remaining 5–year extension options, by July 22, 1999 ("the Vacation Date").[4] Lease Termination Agreement, ¶ 3.a. Specifically, the $5 million lease termination fee was to be paid in three installments. Lease Termination Agreement, ¶ 3.c. and d. The first two payments, each for $1,250,000, totaled $2.5 million, denominated as the Termination Fee Deposit (the "Termination Fee Deposit" or "the Deposit"). *Id.*, ¶ 3.c. Those installments were to be made within 60 days and 120 days, respectively, of the effective date of the Agreement. *Id.* The remaining $2.5 million, described as the Termination Fee Balance ("the Termination Fee Balance" or "the Balance"), was to be paid on the later of the date McKesson vacated the leased premises, or within five business days after the date McKesson notified McKinley that it would vacate such premises. *Id.*, ¶ 3.e.

As McKinley was anxious to proceed with its plan to expand the Walden Galleria, the Lease Termination Agreement provided that the $2.5 million Termination Fee Balance would be increased by an additional $100,000, for each month that McKesson vacated the leased premises prior to July 22, 1999, to a maximum of $600,000. The Agreement further provided that McKesson was not responsible for any Base Rent otherwise due under the Lease from the Agreement's Effective Date until the Vacation Date. Lease Termination Agreement, ¶ 3.b. Accordingly, under the Agreement, McKesson could be compensated by as much as $5.6 million for early termination of the Lease.

The clause which is the subject of the instant litigation of the Lease Termination Agreement provides:

Termination Fee Deposit as Liquidated Damages. IF THE TRANSACTION CONTEMPLATED IN THIS AGREEMENT IS NOT CONSUMMATED DUE TO A DEFAULT BY LANDLORD, TENANT MAY IMMEDIATELY TERMINATE THIS AGREEMENT BY WRITTEN NOTICE TO LANDLORD *AND WITHOUT FURTHER OBLIGATION TO LANDLORD UNDER THIS AGREEMENT, TENANT SHALL RETAIN THE TERMINATION FEE DEPOSIT AS LIQUIDATED DAMAGES, AND THE LEASE (INCLUDING THE EXTENSION OPTIONS) SHALL REMAIN IN FULL FORCE AND EFFECT.* THE PARTIES AGREE THAT TENANT'S ACTUAL DAMAGES AS A RESULT OF LANDLORD'S DEFAULT WOULD BE DIFFICULT OR IMPOSSIBLE TO DETERMINE, AND THE TERMINATION FEE DEPOSIT IS THE BEST ESTIMATE OF THE AMOUNT OF DAMAGES TENANT WOULD SUFFER AS A RESULT OF LANDLORD'S DEFAULT. THE PAYMENT OF THE TERMINATION FEE DEPOSIT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO TENANT. THE PARTIES WITNESS THEIR AGREEMENT TO THIS LIQUIDATED DAMAGES PROVISION BY INITIALING THIS SECTION:

Landlord: (James Soos) Tenant: (James Law)

Lease Termination Agreement, ¶ 4 (emphasis added).

The Agreement contains no provision limiting McKinkley's remedies for money damages and equitable relief in the event of a breach by McKesson. Under ¶ 6.c of the Agreement, McKinley was also required to reimburse McKesson for any real property taxes paid by McKesson attributable to the period after the Vacation Date, within sixty days of such date.

Following execution of the Lease Termination Agreement, McKesson commenced plans to purchase other property on which to construct a new warehouse in preparation for vacating the leased premises. Specifically, on August 12, 1998, McKesson

---

4. A copy of the Lease Termination Agreement is attached as Exhibit B to Law Affidavit.

entered into a contract to purchase 13 acres of undeveloped property in the Town of West Seneca. On August 20, 1998, McKesson entered into a contract with a construction company to begin immediate construction of a new warehouse facility on the property it had acquired and construction commenced on September 3, 1998. On August 21 and October 21, 1998, McKesson received the first two $1,250,000 installments of the Lease Termination Fee due under the Lease Termination Agreement. On November 12, 1998, McKesson formally closed its purchase of the property. The final occupancy permit for the new warehouse was issued on January 30, 1999 and McKesson had, by March 7, 1999, vacated the leased premises and moved all of its personnel, equipment, and inventory to the new facility.

As McKesson had vacated the leased premises more than four months before the Vacation Date, McKesson was entitled, under ¶ 3.b. of the Agreement, to $425,000 in addition to the $2.5 million Termination Fee Balance for a total of $2,925,000 which McKesson maintains was due, under the Agreement, from McKinley on March 15, 1999. However, McKinley failed to provide the payment and thus defaulted as to the Termination Fee Balance.[5] McKesson, on March 26, 1999, offered McKinley an additional 60 days to remit the Balance, $2,500,000 of which would be subject to interest payable at the rate of 12% per annum. When McKinley did not agree to the terms of that offer, McKesson, by letter dated April 9, 1999, notified McKinley that as a result of the default, the Lease Termination Agreement had terminated and McKesson was exercising its rights under the liquidated damages clause. Specifically, McKesson advised it would retain the $2.5 million Termination Fee Deposit and that the Lease would remain in full force and effect, although McKesson no longer had any use for the leased prem-

ises or the warehouse which, to date, remains vacant.

Since then, McKesson has tendered the Basic Rent and real property taxes due under the Lease to McKinley which has routinely refused to accept them. According to McKesson, it is currently holding those amounts in escrow.

### DISCUSSION

McKinley seeks to recover the Termination Fee Deposit from McKesson under two state common law theories including for money had and received and for conversion. McKesson seeks to dismiss the Complaint for failure to state a claim under either of those two theories. Alternatively, McKesson seeks summary judgment on the basis that there is no genuine issue of material fact in dispute, that under the liquidated damages clause of the Lease Termination Agreement, McKesson is entitled to retain the $2.5 million Deposit and that the Lease remains in full force and effect. McKinley cross-moves for summary judgment arguing that there is no genuine issue of material fact in dispute, and that the liquidated damages clause is void *ab initio* as it seeks to compel performance and provides for damages that are disproportionate to any injury actually suffered by McKesson attributed to McKinley's default.

Whether the Complaint states a claim for either money had and received or conversion turns on whether the liquidated damages clause is valid and enforceable, or void *ab initio*, an issue which is before the court on summary judgment. Accordingly, although McKesson alternatively moves for summary judgment, the court first addresses the parties' summary judgment arguments.

On the record before it, the court finds that the liquidated damages clause is not void *ab initio*. Alternatively, should the District Judge disagree, the court finds the

---

5. The record does not indicate why McKinley defaulted on payment of the Termination Fee Balance; however McKinley, while admitting it defaulted on the payment, maintains the reasons for such default are irrelevant to the instant action. Plaintiff's Memorandum at 3.

Complaint also fails to state a claim for money had and received or for conversion. Further, should the District Judge find that the liquidated damages clause is void, but that the Complaint does state a claim on either asserted ground, McKesson should be permitted to file an answer asserting a counterclaim as it has not lost such right by electing to proceed under a clause that is, in that event, essentially, a nullity.

## 1. *Summary Judgment*

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex, supra*, at 322, 106 S.Ct. 2548.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra*, at 247–48, 106 S.Ct. 2505.

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex, supra*, at 323–24, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir.1998).

Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995). In opposing a motion for summary judgment a party "may not simply rely on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga, supra*, at 18 (citing cases).

As a preliminary matter, McKinley asserts that the liquidated damages clause was drafted solely by McKesson's attorneys who refused to incorporate any changes suggested by McKinley and insisted on including what McKinley characterizes as a "draconian penalty" to assure McKinley's performance under the Agreement. Soos Affidavit, ¶ 7. McKesson does not dispute that the liquidated damages clause was drafted by its attorneys.

As the language in the liquidated damages clause is McKesson's, the court construes any ambiguity in the clause in McKinley's favor. *Perini Corporation v. City of New York (Pulaski Bridge)*, 178 F.3d 90, 94 (2d Cir.1999); *Moran v. Standard Oil Co. of New York*, 211 N.Y. 187, 105 N.E. 217, 220 (1914). Nevertheless, the court must also give the liquidated damages clause the meaning which McKesson, the party who drafted the clause, "ought reasonably to have understood that [McKinley] would put upon them." *Moran, supra.* Further, in construing language used in a contract, the law "does not look for precise balance of phrase, promise matched against promise in perfect equilibrium." *Id.* at 221.

McKesson argues in support of summary judgment that the Lease Termination Agreement is a binding contract negotiated at arm's length between McKesson and McKinley who were both represented by experienced counsel, and which clearly entitles McKesson to retain the Termination Fee Deposit under the current circumstances. Defendant's Memorandum at 14–15. McKinley asserts the liquidated damages clause is void *ab initio* on five grounds including: (1) the claimed damages are wholly disproportionate to McKesson's actual loss; (2) the liquidated damages clause is intended solely to compel McKinley's performance; (3) as written, the liquidated damages clause is triggered by even a trivial breach of the Agreement, thereby rendering the clause unenforceable as a penalty; (4) McKesson's potential damages in the event of default were readily calculable when the Agreement was executed; and (5) New York public policy bars enforcement of the liquidated damages clause as it is a penalty and that its inclusion demonstrates the parties' disparate negotiating power which renders the Agreement an adhesion contract. Plaintiff's Memorandum at 11–21.

Whether the liquidated damages clause is void *ab initio* as an unenforceable penalty permeates the summary judgment arguments. That issue turns on whether the liquidated damages clause in this case provides for damages that are disproportionate to McKesson's potential loss at the time the Agreement was executed, whether such clause compels performance by a party who might otherwise default, and whether the liquidated damages clause may be invoked upon a party's breach of a non-substantial contract provision. Accordingly, McKinley's fourth argument in support of its cross-motion for summary judgment regarding the calculability of McKesson's damages in the event of McKinley's default, is subsumed by the first three arguments advanced in support of summary judgment regarding the proportionality of the liquidated damages to McKesson's potential loss and the court discusses both arguments together. Further, McKinley's fifth argument will be separately addressed only insofar as it posits that the bargaining power of the parties was so unbalanced that the Agreement is a contract of adhesion.

In this case, the court, construing the liquidated damages clause in accordance with how McKesson, as drafter, should reasonably have understood McKinley would interpret it, finds the liquidated damages clause is not unenforceable as it (1) does not provide for damages that are disproportionate to the amount of damages McKesson, at the time of execution, may foreseeably have incurred, (2) does not seek to compel McKinley's performance, (3) is not triggered by non-substantial breaches of the Agreement, and (4) does not render the Agreement an adhesion contract and thus void as against public policy.

### A. *Proportionality of Liquidated Damages*

McKinley asserts that enforcement of the liquidated damages provision cannot be sustained by this court as McKesson is unable to establish either that the amount of liquidated damages is reasonably proportionate to the probable loss, or the

liquidated damages were intended to compensate McKesson for an amount of actual loss that was difficult or impossible to precisely estimate at the time of the contract as required under New York Law. Plaintiff's Memorandum at 11 (citing *Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015, 1018 (1977), and *Vernitron Corp. v. CF 48 Assocs.*, 104 A.D.2d 409, 478 N.Y.S.2d 933, 934 (2d Dep't 1984)). McKesson concedes that a liquidated damages penalty can be sustained under either of these criteria, but maintains that it is McKinley's burden to establish that under the circumstances existing when the Agreement was executed, the liquidated damages were "plainly disproportionate" to McKesson's potential loss should McKinley default under the Agreement or that McKesson's potential loss was capable of precise estimation. Defendant's Response/Reply Memorandum at 14.

Whether a provision is an enforceable liquidated damages provision or an unenforceable penalty is a matter of law to be decided by the court. *Vernitron, supra*, at 934. "A contractual provision fixing damages in the event of a breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." *Truck Rent–A–Center, supra*, at 1018. In determining whether a contractual provision provides for enforceable liquidated damages or for an unenforceable penalty, the contract must be interpreted in light of the potential loss discernable as of the date of its execution, rather than as of the date of the breach. *Truck Rent–A–Center, supra*, at 1019; *Vernitron Corp., supra*, at 934. "[A]ny reasonable doubt as to whether a provision constitutes an unenforceable penalty or a legitimate damages clause should be resolved in favor of a construction which holds the provision to be a penalty." *Vernitron, supra* (citing *National Telecanvass Associates, Ltd. v.*

*Smith*, 98 A.D.2d 796, 470 N.Y.S.2d 22, 24 (2d Dep't 1983)). "Nevertheless, courts uphold contractual provisions fixing damages for breach when the terms constitute a reasonable mechanism for estimating the compensation which should be paid to satisfy any loss flowing from the breach." *Kahuna Group, Inc. v. Scarano Boat Bldg., Inc.*, 984 F.Supp. 109, 117 (N.D.N.Y. 1997) (citing *Leasing Service Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir.1982); *Truck Rent–A–Center, supra*, at 1017, and *Wirth & Hamid Fair Booking v. Wirth*, 265 N.Y. 214, 192 N.E. 297, 301 (1934)). Generally, courts should not interfere with an agreement for liquidated damages absent some persuasive justification. *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113, 116 (1979).

As explained by the New York Court of Appeals,

> [l]iquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract. In effect, a liquidated damage provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement. Parties to a contract have the right to agree to such clauses, provided that the clause is neither unconscionable nor contrary to public policy. Provisions for liquidated damage have value in those situations where it would be difficult, if not actually impossible, to calculate the amount of actual damages to be paid upon breach rather than leaving that amount to the calculation of a court or jury.

*Truck Rent–A–Center, supra*, at 1017–18 (1977) (internal citations omitted).

In this case, McKinley asserts that the liquidated damages clause fixes damages in an amount that is wholly disproportionate to McKesson's potential damages which were easily calculable when the

Agreement was executed. Despite its assertion to the contrary, McKinley, which has conceded it defaulted under the Agreement, has the burden to demonstrate that the liquidated damages provision is a penalty. *Rattigan v. Commodore International Ltd.*, 739 F.Supp. 167, 170 (S.D.N.Y. 1990) (citing *Harbor Island Spa, Inc. v. Norwegian America Line A/S*, 314 F.Supp. 471, 474 (S.D.N.Y.1970); and *P.J. Carlin Construction Co. v. City of New York*, 59 A.D.2d 847, 399 N.Y.S.2d 13, 14 (1st Dep't 1977)).

According to McKinley, as of June 22, 1998, the date the Agreement was executed, the liquidated damages were easily calculable as the difference between the total Lease Termination Fee and the Termination Fee Deposit, and that the $8.9 million McKesson spent in constructing the new warehouse facility is irrelevant. Plaintiff's Memorandum at 17–18. McKinley contends that upon its failure to remit to McKesson the Termination Fee Balance, McKesson had the right to either cancel the Lease Termination Agreement and, thus, not surrender its leasehold interest in the premises, or to assert a claim against McKinley for the Balance, *Id.* at 14, but that by electing to cancel the Agreement, Defendant chose to return the parties to their *status quo ante* and thus McKesson, as a matter of law, is barred from retaining both the $2.5 million Deposit and the leasehold interest, which, under the Agreement, has a negotiated value of $5 million. *Id.* Both arguments fail for several reasons.

As written, the liquidated damages provision does not permit McKesson to return the Termination Fee Deposit, yet retain the Lease in full force and effect, thereby returning the parties to their *status quo ante*. Rather, the Agreement provides that in the event McKinley defaults under the Agreement, "Tenant *shall* retain the termination fee deposit as liquidated damages, *and* the lease (including the extension options) *shall* remain in full force and effect." Agreement, ¶ 4 (italics added).

The use of the conjunction "and" in the liquidated damages clause demonstrates that upon McKinley's default, in lieu of an action based on McKinley's breach and full damages, McKesson shall both retain the $2.5 million Termination Fee Deposit and keep the Lease in full force and effect. That the liquidated damages clause was expressly intended to operate in the event that McKinley defaulted on the third of three Termination Fee payments, namely, the Termination Fee Balance of $2.5 million, plus any adjustment for vacating the premises early, Agreement, ¶ 4.d and e, also is evident by the language permitting McKesson to retain the "Termination Fee Deposit" which is comprised of the first two Termination Fee payments, each worth $1.25 million. Agreement, ¶ 4.c. Thus, the Agreement does not provide McKesson with the option of keeping the lease in full force and effect while returning the Deposit. To find otherwise, as McKinley contends, requires the court effectively to rewrite the agreement to suit McKinley's *post hoc* view of the transaction.

McKinley argues that by electing to keep the Lease in full force and effect, McKesson chose to cancel the Agreement and return the parties to their *status quo ante*. Plaintiff's Memorandum at 11–14. This argument, however, ignores the fact that by executing the Agreement, McKesson undertook a binding obligation to vacate the premises by July 22, 1999, thereby requiring McKesson to locate another site for its warehouse operations and effect a transfer of its operations. McKinley does not dispute that McKesson constructed a new warehouse facility to which McKesson had relocated its distribution operations by March 7, 1999, or that McKesson no longer has any use for the leased premises, which remain vacant, although McKesson remains liable under the Lease for payment of rent and property taxes. Under these circumstances, requiring McKesson to refund the Termination

Fee Deposit will return only McKinley to its *status quo ante*.

The continuation of the original lease for the premises is therefore not a means to return the parties to the *status quo ante;* rather, by preventing expansion into the leased premises by McKinley, the revived leasehold assures McKinley does not gain its objectives as a reward for default. The lease continuation component of the liquidated damages clause thus operates not to return the parties to their pre-Agreement positions, but to further assure McKinley's full performance.

Nor is there any merit to McKinley's argument that McKesson did not suffer any damages in constructing a new warehouse facility as the value of such facility is equal to the amount McKesson spent in constructing it. *See* Plaintiff's Memorandum at 18. That argument ignores the fact that McKesson was required to spend money to purchase land on which to construct its new warehouse facility in excess of what it would otherwise have spent had McKesson maintained its warehouse operations at the leased premises and continued to exercise its lease renewal options as planned. Specifically, McKesson has submitted an affidavit in which Law explains that the terms of the Lease were very favorable to McKesson, requiring annual rent payments of $18,524 for the year 1998 and $14,820 for the following years, which were "well below the market rate for similar space." Law Affidavit, ¶ 6; Law Reply Affidavit, ¶ 3. McKinley does not contradict these statements. Thus, but for McKinley's desire to buyout McKesson's leasehold interest, McKesson planned to continue to renew the Lease and would have paid a total of $74,100 [6] in rent for the five year term beginning January 1, 1999 and continuing through December 31, 2004. McKesson maintains, and McKinley does not dispute, that it was unlikely to find another warehouse to rent at such favorable terms elsewhere. Law Reply Affidavit, ¶ 3. Given the expectation, real-

ized in fact, of the parties that McKesson would vacate, with alacrity and at substantial costs, it cannot be credibly maintained, as McKinley asserts, that the liquidated damages clause was merely intended to return the parties to their *status quo ante*.

McKinley's assertion that McKesson's invocation of the liquidated damages provision has resulted in a windfall to McKesson, Plaintiff's Memorandum at 15, is also without merit. That argument is predicated on the fact that the negotiated value of the Lease under the Agreement was $5 million as that is the amount of money McKinley agreed to pay McKesson in return for McKesson relinquishing its leasehold interest and vacating the leased premises by July 22, 1999. *Id.* McKinley thus asserts that by permitting McKesson to retain both the $2.5 million Termination Fee Deposit and its interest in the Lease with a negotiated value of $5 million, McKesson has recognized a windfall of $2.5 million. *Id.* The reality of the transaction shows otherwise.

In particular, the parties agree that the $5 million "negotiated value" of the Lease greatly exceeded the market value of the Lease. Plaintiff's Reply Memorandum at 4–5; Defendant's Response/Reply Memorandum at 15; Law Reply Affidavit, ¶ 11. As explained by McKesson, McKinley agreed to purchase McKesson's interest in the Lease for a premium price because the property had unique value to Pyramid, McKinley's affiliate. Defendant's Response/Reply Memorandum at 15. Significantly, McKinley desired McKesson's leasehold interest not because it intended to continue to rent the property but, rather, because it expected to sell the property to Pyramid in connection with a then-planned expansion of the Walden Galleria, a deal one can fairly presume was expected to benefit substantially both McKinley and Pyramid, thus motivating the parties

---

6. *$14,820 annual rent X 5 years = $74,100.*

to arrive at the negotiated price of $5 million.

As it turned out, McKinley ultimately did not sell the property as it had anticipated on June 22, 1998. However, having executed the Agreement, McKesson went through with its plan to obtain another warehouse facility for its operations so as to be able to vacate the Leased Premises by July 22, 1999, as it was obligated to do under the Agreement. The construction of the new warehouse facility cost McKesson between $8.9 million and $10 million, Law Affidavit, ¶ 20; Law Reply Affidavit, ¶ 14, money that McKesson would not have had to spend if it had refused McKinley's offer and chose to remain at the Leased Premises. By contrast, however, McKesson received only $2.5 million of the $5.425 million to which it became entitled under the Agreement, plus the cost of avoiding a default on its part by maintaining rent and tax payments for at least the second 5-year option period of the Lease.

Further, as explained by Mr. Law, given the lack of demand for commercial warehouse space in the vicinity of Erie County, there was no guarantee that once McKesson had constructed its warehouse and no longer had any use for the leased premises, it would have been able to sublet the premises to a suitable tenant at a "break even" cost for the remaining term of the Lease. Law Reply Affidavit, ¶ 8. For example, as McKesson had been advised that McKinley intended to demolish the warehouse after McKesson vacated it, McKesson removed lighting fixtures, thereby degrading the building which, as a result, needs a new roof, lighting fixtures and a sprinkler system installed. *Id.,* ¶ 9. Repairs totaling $800,000 are now required before the warehouse can even be sublet. *Id.* McKesson would also incur commercial brokerage fees. *Id.,* ¶ 10. McKesson estimates the Lease has a maximum net present value of less than $500,000. *Id.,* ¶ 11. Indeed, McKesson's only purchase offer for its unexpired leasehold interest was $300,000. *Id.,* ¶ 12. On this record, there is therefore no basis for McKinley's argument that enforcing the liquidated damages clause would yield a windfall to McKesson, rendering the liquidated damages clause unenforceable as a penalty.

Nor is there any merit to McKinley's argument that McKesson's potential damages were easily calculable as of the execution of the Agreement on June 22, 1998 as the difference between the Termination Fee and the Termination Fee Deposit. Plaintiff's Memorandum at 13–14, 17–18. That McKesson chose to acquire property and construct a new warehouse facility rather than to lease another warehouse is irrelevant to the fact that regardless of the precise nature of McKesson's decision, unless it terminated business operations, it would incur certain costs. Such costs included inspecting potential sites located in Buffalo, Syracuse, Rochester and Rome, New York, and also the complicated task of relocating its distribution operations, thereby exposing itself to potential costly business interruptions. Law Reply Affidavit, ¶ 3. The relatively short time frame McKesson had to vacate the Leased Premises required it to incur construction costs even before it received the first of the three Lease Termination Fee payments in August 1998. As of June 22, 1998, McKesson had yet to find land on which to construct its new warehouse facility. Even if McKesson had chosen to lease other premises, given McKesson's substantial space requirements, it is quite likely any new landlord would have required a long-term lease or a significant security deposit, if not both, resulting in serious financial exposure to McKesson if the terms of the Agreement were not ultimately consummated. Moreover, McKinley's theory overlooks the reality of construction schedules which frequently are delayed beyond the parties' expectations resulting in potentially substantial business losses to the developer, in this case McKesson. The fact that McKesson was able to acquire a suitable relocation site does not negate the presence of this risk factor to McKesson at

the time of execution of the Agreement. Thus, as of June 22, 1998, the date the Agreement was executed, McKesson's potential damages in the event McKinley defaulted under the Agreement were difficult, if not impossible, to estimate.

Here, a fair reading of the entire Agreement, including ¶ 4, the liquidated damages provision, thus demonstrates that both McKinley and McKesson were assuming substantial risks by entering into the Agreement. In particular, McKinley was assuming the risk that Pyramid was willing to pay at least $ 5.6 million dollars, the total potential Termination Fee, for the leased premises to facilitate a then anticipated expansion of the Walden Galleria. McKesson assumed the risk that a suitable replacement warehouse facility would likely cost significantly more than it was currently required to pay under the Lease as to which McKesson had planned to exercise its extension options for the foreseeable future, a fact not disputed for summary judgment purposes. That McKinley's (and Pyramid's) plans apparently did not materialize, thereby leaving McKinley exposed to the risk it accepted under the Agreement, *i.e.*, that the Termination Fee Deposit constituted a non-refundable inducement to McKesson, does not negate the court's finding that as of the Agreement's execution, McKesson's potential damages were difficult, if not impossible, to estimate.

For the above reasons, summary judgment in favor of McKinley should be DENIED on this ground.

## B. *Liquidated Damages Clause As Compelling Performance*

■ McKinley also asserts that the liquidated damages clause was intended solely to compel performance, rendering it a penalty and, therefore, unenforceable as the enforcement of the clause would put McKesson in a better position than McKesson would have been in had McKinley fully performed. Plaintiff's Memorandum at 15. Specifically, McKinley maintains that by granting McKesson the right to retain the $2.5 million Termination Fee Deposit, an amount equal to 50% of the negotiated Lease Termination Fee, and permitting McKesson to retain the leasehold interest with a negotiated value of $5 million, the liquidated damages clause confers on McKesson an unearned windfall of $2.5 million which McKesson, in drafting the liquidated damages clause, intended as a means of compelling McKinley's performance under the Agreement. *Id.* McKesson argues in opposition that the liquidated damages clause does not provide for an unconscionable penalty as the remedy it provides is not disproportionate to the actual damages caused by McKinley's breach. Defendant's Response/Reply Memorandum at 13–19.

"A [liquidated damages] clause which provides for an amount plainly disproportionate to actual damages is deemed a penalty and not enforceable because it compels performance by the very disproportion between liquidated and actual damages." *Wilmington Trust Co. v. Aerovias de Mexico, S.A.,* 893 F.Supp. 215, 218 (S.D.N.Y.1995) (citing cases). "The rationale for this principle is that contractual terms fixing damages in an amount clearly disproportionate to actual loss seek to deter breach through compulsion and have an *in terrorem* effect: fearing severe economic loss, the promisor is compelled to continue performance, while the promisee may reap a windfall well in excess of his just compensation." *Leasing Service Corp., supra,* at 73.

A rudimentary review of the information supplied to the court indicates that McKesson did not reap any windfall as a result of the liquidated damages clause. For example, the annual rent on the leased premises for the second 5–year Lease extension was approximately $14,820. Assuming, for the sake of this discussion, that was also the annual rent for the four remaining 5–year options, McKesson would have to pay a total of $370,500 in rent over the remaining 25 years under the Lease extensions

($14,820 X 25 years). The annual real property taxes paid on the property by McKesson is not provided, but even if McKesson paid the same amount in real property taxes as in rent, McKesson would then be required to pay a total of $741,000 in both rent and property taxes over 25 years if McKesson exercised all its extension options ($370,500 total rent + $370,500 total real property taxes). McKesson would still have to pay maintenance and utilities regardless of whether it exercised all its Lease extension options or

chose to sell its interest in the Lease to McKinley and secured a replacement facility. As it were, it cost McKesson between $8.9 million and $10 million to construct its new warehouse facility. Even if McKesson had received the full $5,600,000 to which it was potentially entitled under the Agreement, using the lower cost estimate, McKesson would still have incurred $ 2,734,000 in additional costs over the next 25 years than it would have had it continued to lease the existing warehouse, calculated as follows:

| | |
|---|---|
| $8,900,000 | cost of constructing new warehouse facility |
| − $5,600,000 | potential total Lease Termination Fee |
| $3,300,000 | out-of-pocket expense to construct new warehouse facility |
| − $ 741,000 | annual rent and property taxes over 25 years under Lease |
| $2,559,000 | additional cost to McKesson to construct new warehouse facility rather than to remain at the leased premises for next 25 years. |

---

The amount McKesson saved by not paying rent on the leased premises from the date the Agreement was executed, June 22, 1998, until McKesson vacated the premises, is insignificant to this analysis.

McKesson has not attempted to explain how it was economically feasible for it to construct a new warehouse especially if the new construction facility cost $10 million and McKesson received only the $2.5 million Termination Fee Deposit under the Agreement. Nevertheless, the court can conceive of circumstances which would have made the project attractive to McKesson, such as increased efficiency, decreased maintenance costs, depreciation and tax breaks, or any possibility that McKesson could consolidate some of its operations located elsewhere at the new facility. Nor has McKinley proffered any analysis as to how permitting McKesson to retain the Termination Fee Deposit, de-

spite having spent considerably more to construct a new warehouse facility, would result in a windfall to McKesson.[7]

 Although discovery in the action has yet to commence, McKinley has not moved under Fed.R.Civ.P. 56(f) for an order permitting such discovery so as to enable McKinley to submit sufficient evidence indicating the existence of material issues of fact on this point, as is its burden. Summary judgment may be granted against a party who has had no opportunity to conduct discovery, provided such party failed to request discovery. *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir.1999) (holding district court did not err in granting summary judgment against plaintiff who had no opportunity to conduct any discovery where plaintiff filed affidavits in opposition to summary judgment yet failed to mention any need for discovery). A

7. As stated, McKesson has continued to tender rent and property tax payments as required under the Lease, thereby avoiding any grounds on which McKinley could evict McKesson and regain possession of the leased premises. It therefore is unlikely that McKinley could regain possession of the leased

premises absent a new agreement with McKesson which could cost McKinley more than the amount that was due as the Termination Fee Balance under the Agreement. However, that problem is one of McKinley's own making and is, in any event, irrelevant for purposes of the instant motions.

party seeking discovery under Rule 56(f) so as to avoid summary judgment must file an affidavit with the court stating (i) what facts are sought; (ii) how they create genuine issue; (iii) what effort has been made to obtain them; and (iv) why efforts have been unsuccessful. *Hudson River Sloop Clearwater, Inc. v. Department of the Navy.* 891 F.2d 414, 422 (2d Cir.1989). Moreover, "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate," and the court may decide the motion without allowing further discovery. *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir. 1994).

Here the court finds, based on the record before it on summary judgment, that no reasonable finder of fact could conclude that enforcement of the liquidated damages clause would compel McKinley to perform as required under the Agreement because a default would result in a windfall to McKesson. Accordingly, McKinley's motion for summary judgment should, on this ground, be DENIED.

## C. *Non-substantial Default Does Not Compel Forfeiture*

█ McKinley contends that the liquidated damages clause compels forfeiture of the Termination Fee Deposit in the event of any default under the Agreement, including a breach of McKinley's obligation under ¶ 6.c to reimburse McKesson for any portion of the real property taxes paid by McKesson that is attributable to the period after the Vacation Date. Plaintiff's Memorandum at 15–17. McKinley maintains that in such circumstances, the liquidated damages clause cannot be considered as a bona fide estimate of McKesson's prospective loss, rendering the clause void as it is intended to compel performance. *Id.* at 17. In opposition, McKesson argues that the liquidated damages clause could not, under the Agreement, be triggered by an insubstantial breach such as by McKinley's failure to reimburse McKesson for

property taxes in accordance with ¶ 6.c. Defendant's Response/Reply Affidavit at 22–23. Specifically, McKesson states that as the Agreement provides that the Termination Fee Balance was due and payable not later than five days after the Vacation Date, and as the property taxes were to be refunded within 60 days after the Vacation Date, a breach of ¶ 6.c could not trigger the liquidated damages provision as the Agreement would have either been breached or consummated some 55 days earlier. *Id.* at 23. McKesson further maintains that where a contract contains several covenants of varying degrees of importance, a liquidated damages provision will be upheld if the intent of the parties is for the provision to be triggered only by a breach of a material covenant. *Id.* at 23.

"[E]quity abhors forfeitures and courts will examine the sum reserved under an instrument as liquidated damages to insure that it is not disproportionate to the damages actually arising from the breach or designed to coerce the performance of a party." *Fifty States Management Corp., supra.,* at 116. However, where a contract clause is intended to secure a party's performance of a material element of a bargained-for agreement, "its enforcement works no forfeiture." *Id.* (holding rent-acceleration clause in lease was enforceable as liquidated damages upon tenant's breach of material element of contract where sum reserved for damages was no greater than the amount breaching tenant would have paid upon full compliance with lease).

In *Hackenheimer v. Kurtzmann,* 235 N.Y. 57, 138 N.E. 735 (1923), the defendants, in connection with a contract for the sale of all the defendant's stock in a corporation, a piano company bearing the defendants' family name, agreed to refrain from using such name for a period of years in any way that would interfere with the goodwill of the piano company's name. The defendants' compliance was also required, under the contract, as to lesser provisions including, *e.g.,* that defendants

would immediately return to the plaintiffs any mail matter mistakenly received. *Hackenheimer, supra,* at 738. A liquidated damages clause provided for the plaintiffs to recover $50,000 from the defendants "in the case of breach of the agreements herein contained upon the part of the [defendants]." *Id.* at 737. While the stock sale contract was in effect, the defendants breached the contract's primary provision by starting another piano company named after the family, and the plaintiffs then commenced an action to recover liquidated damages under the contract. *Id.* The defendants argued the liquidated damages clause was unenforceable as a penalty as it could be construed as providing for recovery of the same amount for the breach of even the most trivial contract covenant which would result in losses disproportionate to the sum established as liquidated damages. *Id.* at 738. The court held that a fair construction of the contract in its entirety demonstrated the liquidated damages clause was only intended to protect the good will interest in the family name, rather than to guard against any trivial breach. *Id.* Accordingly, the court upheld the liquidated damages clause. *Id.* at 739.

Other courts, relying on *Hackenheimer,* have upheld similar liquidated damages provisions where a material term of the contract is breached, even though the liquidated damages would be considered a disproportionate penalty if applied in the case of a minor contract breach which would have been permitted under a strict interpretation of the contract. *See Jordache Enterprise, Inc. v. Global Union Bank,* 688 F.Supp. 939, 944 (S.D.N.Y.1988) (upholding liquidated damages clause relating to loss of shipment and apportioning such damages to reflect actual percentage of shipment lost); *Judy Bond, Inc. v. Kreindler,* 36 Misc.2d 943, 234 N.Y.S.2d 375, 379 (Sup.Ct.N.Y.Co.1962) (upholding arbitrator's construction of liquidated damages clause as intended to apply only to material breach of contract's intended purpose, although a "severely literal construc-

tion" would have rendered clause void as a penalty as to breaches of minor covenants), *aff'd,* 18 A.D.2d 1138, 239 N.Y.S.2d 532 (1st Dep't 1963), *appeal denied,* 13 N.Y.2d 595, 242 N.Y.S.2d 1025, 192 N.E.2d 234 (1963) (Table). *Compare Seidlitz v. Auerbach,* 230 N.Y. 167, 129 N.E. 461 (1920) (refusing to enforce purported liquidated damages clause as it was not possible to separate as to material and minor covenants liquidated damages consisting of a security deposit intended to ensure a tenant's performance of all covenants contained in the contract).

In this case, the court finds that a fair reading of the Lease Termination Agreement in its entirety demonstrates that the liquidated damages provision refers only to a material breach of the Agreement, *i.e.,* McKinley's default on payment of the full Lease Termination Fee. That the parties did not intend the liquidated damages provision to apply if McKinley defaulted in returning that portion of the real property taxes paid attributable to the period after the Vacation Date is further evident by the fact that McKinley was given only five days from the Vacation Date to pay the Termination Fee Balance, but 60 days from the Vacation Date to refund real property taxes. Given McKinley's apparent need to acquire the leased premises as a prerequisite to Walden Galleria's expansion, it is possible that within 60 days of the Vacation Date, the warehouse on the leased premises would have been demolished as part of the expansion, making it unreasonable to believe the parties even expected the Lease to remain in full force and effect. Accordingly, McKinley's motion for summary judgment should, on this ground, be DENIED.

### D. *Adhesion Contract*

█ McKinley asserts that as McKesson knew that acquisition of the leasehold interest in the leased premises was essential to McKinley's plan to expand the Walden Galleria, McKesson's insistence on in-

cluding the liquidated damages clause in the Agreement rendered the Agreement in effect a contract of adhesion. Plaintiff's Memorandum at 20. In contrast, McKesson maintains that it was McKinley who approached McKesson and persuaded McKesson to relinquish a favorable leasehold interest in the leased premises in exchange for the $5 million Termination Fee. Defendant's Response/Reply Memorandum at 12. McKinley's execution of the Agreement reflects a reasonable business decision based on McKinley's belief that Pyramid intended to expand Walden Galleria. *Id.* Further, were the terms of the Agreement not to McKinley's satisfaction, McKinley could have refused to execute it. *Id.* at 13.

"[T]ypical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis." *Aviall Inc. v. Ryder Sys., Inc.,* 913 F.Supp. 826, 831 (S.D.N.Y.1996). A claim that a particular contract is one of adhesion must be analyzed according to "whether the party seeking to enforce the contract has used high pressure tactics or deceptive language in the contract and whether there is inequality of bargaining power between the parties." *Morris v. Snappy Car Rental, Inc.,* 84 N.Y.2d 21, 614 N.Y.S.2d 362, 637 N.E.2d 253, 256 (1994) (holding indemnification provision in automobile lease agreement was not void and unenforceable as part of adhesion contract where lessee was high school graduate who had attended college, nothing indicated lessee was prevented from reading agreement and requesting explanation of its contents, and lessee signed contract and initialed space next to disputed provision indicating she read and understood both).

As discussed, nothing in the instant record establishes that the Agreement was not freely contracted to by other than able parties and " 'absent some element of fraud, exploitive overreaching, or unconscionable conduct, on the part of [McKes-son], the court must enforce the agreement of the parties.' " *Wilmington Trust Co. v. Aerovias de Mexico, S.A.,* 893 F.Supp. 215, 220 (S.D.N.Y.1995) (quoting *Fifty States Management Corp., supra.,* at 116). A fair reading of the Agreement demonstrates it is not a contract of adhesion as it embodies a bargain struck between sophisticated commercial parties. *See Fiore v. Oakwood Shopping Center, Inc.,* 78 N.Y.2d 572, 578 N.Y.S.2d 115, 585 N.E.2d 364, 369 (1991) (holding contract representing bargain struck between sophisticated commercial parties was not one of adhesion). McKinley's moving papers fail to create any material issue of fact on this point. In particular, the Agreement was executed on McKinley's behalf by Mr. Soos who, as of the execution of the Agreement, was the Walden Galleria's General Manager and a representative of both Pyramid and McKinley. Soos Affidavit, ¶ 1; Plaintiff's Memorandum at 1–3. McKinley does not dispute McKesson's contentions that Pyramid has developed in excess of 23 million square feet in shopping centers, including the Walden Galleria which contains 1.5 million square feet of retail space, and has closed more than $2 billion in construction and permanent loans. Reidy Affidavit, ¶¶ 2–3; Defendant's Response/Reply Memorandum at 12, n. 3. These facts suggest that McKinley was actually the more sophisticated, if not financially more substantial, party to the Agreement. Soos concedes that although McKesson drafted the Agreement, the drafts were reviewed by McKinley's attorneys. Soos Affidavit, ¶ 12. Mr. Soos also separately initialed the space immediately following the liquidated damages provision, which is set out in capitalized typeface. *See* Agreement, ¶ 4. There is thus no basis on which a reasonable trier of fact could find that Soos was not in a position to understand and know whether the terms of the liquidated damages provision were acceptable or that McKinley was other than a sophisticated commercial party.

Nor does the liquidated damages clause demonstrate that McKesson engaged in "exploitative overreaching" as McKinley asserts. Plaintiff's Reply Memorandum at 6. In particular, McKesson remains liable under the liquidated damages provision for both rent and real property tax payments on a warehouse for which it has no use over the next 57 months, even though it received only $2.5 million of the possible $5.6 million bargained for under the Agreement, a figure on which McKesson undoubtedly relied in deciding to construct a replacement warehouse.[8]

Further, that McKesson may have had superior bargaining power with regard to the Agreement than McKinley does not render the Agreement a contract of adhesion. *Westinghouse Electric Corp. v. New York City Transit Authority*, 82 N.Y.2d 47, 603 N.Y.S.2d 404, 623 N.E.2d 531, 535 (1993) ("The court should not, except for compelling reasons, wrest away from contracting parties a superior marketplace bargaining hand and try to equalize relatively arm's length commercial dealings."). Rather, McKesson's position as the party which ultimately controlled whether to terminate its leasehold interest in the leased premises was a factor to be considered by McKinley in calculating the risk it undertook in seeking the Agreement. *See Westinghouse Electric, supra.* That McKinley originally offered McKesson $2 million for relinquishing its interest in the leasehold, and McKesson countered with a $7 million demand, while the parties settled on a final price of $5 million indicates that McKinley was not without any bargaining power. McKinley's contention of inequality of bargaining power is further belied by the fact that although McKesson's foreseeable damages were forecast at $5 million, McKesson succeeded in obtaining only the $2.5 million deposit as liquidated damages. Moreover, McKinley points to nothing in support of its conclusory allegation that the Agreement is rendered a contract of adhesion and conclusory allegations are, without more, insufficient to strike a contract on the ground of adhesion. *Fiore, supra,* at 369 n. 10.

Accordingly, the Agreement is not an adhesion contract and McKinley should be held to the consequences of its own conduct in executing the Agreement, including the liquidated damages clause. Summary judgment therefore should be DENIED on the ground that the liquidated damages provision rendered the Agreement a contract of adhesion.

The record demonstrates McKinley sought and obtained an arrangement that would enable it to gain an economic advantage. Circumstances, apparently, developed which disrupted its plan, and McKinley now seeks to recoup its losses at McKesson's expense. However, it is fundamental that the purpose of contract law is not to assure that parties enter into wise and advantageous agreements, but to assure their agreements are enforced regardless of whether they prove to be wise and advantageous.[9]

---

8. Should McKesson default on payment of rent or real property taxes, McKinley would have the right, under the Lease, to evict McKesson and thereby essentially acquire McKesson's leasehold interest in the premises at a cost of $2.5 million, the amount of the Termination Fee Deposit paid to McKesson. Lease, ¶¶ 6, 8. *See also*, Discussion, *supra,* at 179, noting effect of reinstating the Lease as a means to further prevent McKinley from obtaining its business objective through default.

9. A careful reading of the Agreement reveals that McKinley retained its full range of remedies in the case of McKesson's default, including consequential damages and, importantly, specific performance. Thus, while the liquidated damages clause is solely directed to McKinley's default, the Agreement as a whole, although not creating perfect symmetry regarding remedies, does not leave McKinley defenseless. To the contrary, had McKinley's deal with Pyramid proceeded as originally planned and McKesson refused to act in good faith to vacate, McKesson would have been exposed to equitable relief and, potentially, substantial damages, remedies McKinley would, in the circumstances, undoubtedly have invoked. If, on the other hand, the Agreement had stripped McKinley of such plenary remedies, leaving McKesson with the

## E. *Right to File a Counterclaim*

■ Even if the District Judge were to deny McKesson's summary judgment motion on the basis that the liquidated damages clause is void *ab initio,* summary judgment in favor of McKinley should not be granted as McKesson would be permitted to file an answer asserting defenses and possible counterclaims. In particular, McKinley maintains that McKesson, by electing to exercise its right to terminate the Agreement and hold the Lease in full force and effect, has waived its right to sue McKinley for specific performance under the Agreement or, alternatively, for money damages. Plaintiff's Reply Memorandum at 7. McKesson, however, contends that as McKinley's summary judgment motion is entirely premised on the theory that the liquidated damages clause is unenforceable then, should the court agree, McKesson is entitled to pursue an action for damages against McKinley, which McKesson would assert as a counterclaim in its answer. Defendant's Response/Reply Memorandum at 23, n. 6.

Generally, a defendant must serve an answer within 20 days after being served with the summons and complaint, unless a different time is prescribed by statute. Fed.R.Civ.P. 12(a)(1)(A). Under Fed. R.Civ.P. 12(b), every defense to a complaint, including a counterclaim, must be asserted in the answer, except certain specifically enumerated defenses which may, at the Defendant's option, be made by motion, including a motion to dismiss for failure to state a claim. A defendant is required to file a motion to dismiss under Fed.R.Civ.P. 12(b)(6) before filing an answer. *Woodward v. D.H. Overmyer Co., Inc.,* 428 F.2d 880, 884 (2d Cir.1970), *cert. denied,* 400 U.S. 993, 91 S.Ct. 460, 27 L.Ed.2d 441 (1971). Where a defendant files a motion to dismiss before serving an answer, the date by which a defendant's answer must be served is extended to within 10 days of notice of the court's action on the motion. Fed.R.Civ.P. 12(a)(4)(A).

In *Woodward, supra,* upon being served with a complaint, the defendant moved under Fed.R.Civ.P. 12(b)(6) to dismiss for failure to state a claim, but did not serve an answer. In response, the plaintiff cross-moved for summary judgment. The district court denied the defendant's motion to dismiss and granted the plaintiff's motion for summary judgment against the defendant, who had never filed an answer. The defendant appealed the entry of summary judgment against it on the basis that it deprived the defendant of its right conferred by Fed.R.Civ.P. 12(a) to file an answer asserting a counter claim within 10 days of the court's denial of the defendant's motion to dismiss. *Woodward, supra,* at 884. The Second Circuit affirmed the district court's grant of summary judgment in favor of the plaintiff, although it observed the "difficulty that may arise when a defendant, as required under F.R.Civ.P. [*sic*] 12(b), moves under that rule before answer and the plaintiff counters with a motion for summary judgment." *Id.* In particular, the court acknowledged that it could "conceive of a situation, *e.g.,* where a defendant acquired a counterclaim after submission of a plaintiff's summary judgment motion, where a contention of this sort [that the defendant's right to assert a counterclaim was in jeopardy] might have merit." *Id.* The court, in affirming summary judgment in the plaintiff's favor, noted that nothing prevented the defendants from asserting their counterclaim earlier. *Id.* Moreover, the court indicated that the district judge may have permitted the defendants to assert a counterclaim if they had done so within 10 days of the denial of their summary judgment motion. *Id.* at 885.

Here, until a court invalidates the liquidated damages provision, McKesson would

---

benefits of the liquidated damages clause in the event of a default by McKinley, or even by both parties, McKinley's attack on the liqui-

dated damages clause might have greater plausibility.

have no basis, consistent with Fed.R.Civ.P. 11, to assert a counterclaim for breach of contract as the liquidated damages clause, by its terms, forecloses such a claim. As such, McKesson cannot assert a counterclaim for monetary damages against McKinley so long as the liquidated damages provision is enforceable. However, should the liquidated damages clause be found unenforceable, it follows that the Agreement did not provide McKesson with any remedy. As such, McKesson cannot reasonably be said to have elected its remedy under the Agreement, and thereby waived its right to assert a counterclaim for damages based on McKinley's breach of the Agreement.

To summarize, McKesson's motion for summary judgment should be GRANTED; McKinley's cross-motion for summary judgment should be DENIED. However, even if the District Judge denies McKesson's summary judgment motion, summary judgment in favor of McKinley should not be entered as McKesson must be permitted an opportunity to serve, within 10 days of the District Judge's decision, an answer asserting counterclaims, as provided for under Fed.R.Civ.P. 12(a)(4)(A).

### 2. *Failure to State a Claim*

Should the District Judge find that summary judgment should not be granted in favor of either McKinley or McKesson, the court addresses whether the Complaint should be dismissed for failure to state a claim for either for money had and received or for conversion.

On a motion to dismiss under Fed. R.Civ.P. 12(b)(6) for failure to state a claim, the court looks to the four corners of the complaint and is required to accept the plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995), *cert. denied*, 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996); *Hill v.*

*City of New York*, 45 F.3d 653, 657 (2d Cir.1995). The court is required to read the complaint with great generosity on a motion to dismiss. *Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555 (2d Cir.1985). The complaint may be dismissed only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The issue is not whether a plaintiff is likely to prevail ultimately, "but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Weisman v. LeLandais*, 532 F.2d 308, 311 (2d Cir.1976) (quoting *Scheuer, supra*, at 236, 94 S.Ct. 1683).

▮ Pursuant to Fed.R.Civ.P. 12(b), if matters outside the pleadings are presented to and not excluded by the court, a party's motion to dismiss under Fed. R.Civ.P. 12(b)(6) shall be treated as one for summary judgment and disposed of as provided by Fed.R.Civ.P. 56. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). A district court may not *sua sponte* convert a motion to dismiss for failure to state a claim into a motion for summary judgment "without sufficient notice to an opposing party and an opportunity for that party to respond." *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir.1995) (citing *In re G. & A. Books, Inc.*, 770 F.2d 288, 294–95 (2d Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986)). However, where the party moving to dismiss has included in the motion papers information not found in the pleadings, provided the "plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the

necessity of transforming a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Industries, Inc., supra.*

## A. *Money Had and Received*

McKesson asserts that the Complaint fails to state a claim for money had and received as such an action lies only where implied in a contract created by law in the absence of an express agreement. Defendant's Memorandum at 3. According to McKesson, that McKinley remitted the $2.5 million Termination Fee Deposit in accordance with the Agreement indicates that said sum was paid pursuant to an express, rather than an implied agreement, thereby negating any action for money had and received. *Id.* at 4. McKinley argues in opposition that the Deposit was not paid to McKesson pursuant to an express agreement as the liquidated damages clause is void and unenforceable. Plaintiff's Reply Memorandum at 3. Accordingly, McKinley urges that McKesson is required to return said fee pursuant to an implied contract. *Id.*

An action for money had and received is based on an obligation created by law in the absence of an agreement when one party possesses money that in equify and good conscience ought not to be retained as it belongs to another. *Parsa v. State*, 64 N.Y.2d 143, 485 N.Y.S.2d 27, 474 N.E.2d 235, 237 (1984). "The elements of a claim for money had and received are: (1) defendant received money belonging to plaintiff, (2) defendant benefited [*sic*] from the receipt of the money, and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *American Telephone & Telegraph Co. v. North American Industries of New York, Inc.*, 772 F.Supp. 777, 789 (S.D.N.Y.1991) (citing *Nordlicht v. New York Telephone Co.*, 799 F.2d 859, 865 (2d Cir.1986), *cert. denied*, 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987)); *Matter of Estate of Witbeck*, 245 A.D.2d 848, 666 N.Y.S.2d 315 (3d Dep't 1997).

As discussed, McKesson's motion to dismiss for failure to state a claim is before the court as an alternative to summary judgment. McKesson's failure to state a claim argument is thus considered only in the event that summary judgment is not granted, an event which would occur only if the liquidated damages clause is found void and unenforceable. In such case, McKinley could not have paid McKesson the Termination Fee Deposit pursuant to an express agreement, permitting the Agreement to be interpreted as implying that McKesson would return the Deposit to McKinley if the intended sale of the leased premises were not to materialize. Thus, McKesson's motion to dismiss for failure to state a claim for money had and received should not be granted on the basis that McKinley paid the Deposit pursuant to an express agreement.

Nor should the claim be dismissed on the basis that under principles of equity and good conscience, the third element in an action for money had and received, defendant should not be permitted to keep the money. Specifically, the Complaint alleges that the liquidated damages clause is void as a draconian penalty. Complaint, ¶ 19. Absent that clause, nothing in the Agreement explicitly permits McKesson to both retain the $2.5 million Termination Fee Deposit and hold the Lease in full force and effect. The Complaint makes no mention of the fact that McKinley initiated the lease termination transaction based on its desire to obtain possession of the entire fee to the leased premises, thereby enabling McKinley to sell the property to Pyramid. Nor does the Complaint refer to McKesson's need, upon executing the Lease Termination Agreement, to find a suitable replacement facility into which it could move its pharmaceuticals distribution operations. Given the Complaint's silence on such facts, it is not clear beyond a reasonable doubt that under a generous construction of the Complaint, McKinley

would be unable to prove any set of facts entitling it to relief. *Allen, supra,* at 44. For example, the Complaint, standing alone, may be construed as awarding McKesson $2.5 million while holding its rights under the Lease in full force and effect, with no other financial obligations having been undertaken by McKesson in connection with its agreement to terminate the Lease. Without a record of the circumstances surrounding the lease termination transaction, it is possible that McKinley could prove a set of facts establishing that, under principles of equity and good conscience, McKesson should not be permitted to keep the money. McKinley has thus pleaded a cause of action for money had and received.

 McKesson, however, maintains that the third element of a cause of action for money had and received, *i.e.,* " 'whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered,' " cannot be sustained against a party who has "suffered 'a detrimental, material and irrevocable change of position,' in reliance on another's payment of money." Defendant's Memorandum at 5 (quoting *Liberty Mutual Ins. Co. v. Newman,* 92 A.D.2d 613, 459 N.Y.S.2d 806, 808 (2d Dep't 1983)). At issue in *Liberty Mutual Ins. Co. supra,* was whether a workers' compensation insurer which had mistakenly made a lump sum payment to a claimant, rather than to a trust fund which would have distributed the money to the claimant in weekly payments over a period of years, was entitled to recover its erroneous payment in an equity action. *Liberty Mutual Ins. Co., supra,* at 808. The court held that before such recovery could be permitted, the defendant must be permitted an opportunity to demonstrate a detrimental change in position in the event such recovery were permitted. In support of this argument, McKesson relies on statements contained in paragraphs 16 to 18 of the Law Affidavit as well as paragraph 14 of the Law Reply Affidavit which explain that McKesson, in

anticipation of McKinley's full performance under the Agreement, spent more than $10 million to purchase land and construct its new warehouse facility, thereby irrevocably changing its position. Law Affidavit, ¶¶ 16–18; Law Reply Affidavit, ¶ 14. McKinley, however, has submitted nothing in opposition.

As discussed, in considering whether to dismiss a complaint for failure to state a claim, the court generally is restricted to the four corners of the complaint. *Scheuer, supra,* at 236, 94 S.Ct. 1683; *Villager Pond, Inc., supra,* at 378; *Hill, supra,* at 657. However, where matters outside the pleading are presented to and not excluded by the court, a party's motion to dismiss under Fed.R.Civ.P. 12(b)(6) shall be treated as one for summary judgment and disposed of as provided by Fed. R.Civ.P. 56. *Cortec Industries, Inc, supra.,* at 48. Further, where the non-moving party should have been on notice that the motion to dismiss may be converted to one for summary judgment, the non-moving party need not be specifically notified of such conversion. *Groden, supra,* at 1052–53 (holding district court did not err in *sua sponte* converting motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) into motion for summary judgment under Fed. R.Civ.P. 56 without sufficient notice to the non-moving party as the defendant sought summary judgment as an alternative form of relief to dismissal for failure to state a claim). Likewise, in the instant case, in addition to moving to dismiss for failure to state a claim, McKesson has alternatively moved for summary judgment. McKinley thus may be fairly deemed on notice that summary judgment would apply to this claim. *Groden, supra.*

Here, the court finds that McKinley has failed to meet its burden of establishing that a genuine issue of material fact exists as to whether McKesson irrevocably changed its position in reliance on McKinley's full performance under the Agreement such that, under principles of equity and good conscience, McKesson should not

be permitted to keep the money. Specifically, McKinley submits nothing other than conclusory allegations in opposition to McKesson's supporting affidavits. *E.g.*, Soos Affidavit, ¶¶ 17, 18, 19, 20. Conclusory allegations that affidavits supporting a summary judgment motion are not credible are, however, insufficient to establish an issue of fact to avoid summary judgment. *Goenaga, supra*, at 18. Accordingly, the motion to dismiss for failure to state a claim for money had and received, treated as a motion for summary judgment on McKinley's claim, should be GRANTED.

**B. *Conversion***

McKesson also seeks to dismiss the Complaint for failure to state a claim for conversion. Defendant's Memorandum at 11–12. According to McKesson, McKinley's conversion claim is legally insufficient as, given McKinley's conceded default under the Agreement, the Agreement's liquidated damages clause prevents McKinley from alleging an ownership or possessory right to the funds at issue, an essential element to a conversion claim. *Id.* McKinley counters that by pleading that the liquidated damages clause is unenforceable as a penalty, McKinley has pleaded its "'immediate superior right of possession' to the $2.5 million Termination Fee Agreement." Plaintiff's Memorandum at 9 (quoting *Meese v. Miller*, 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (4th Dep't 1981)).

The three basic elements of a cause of action for conversion include (1) intent; (2) interference with property rights to the exclusion of such rights; and (3) possession or right to possession. *Meese, supra*, at 501. If, as McKinley asserts, the liquidated damages clause is void *ab initio*, then the Agreement is silent as to whether, upon a default by McKinley, McKesson may retain the Termination Fee Deposit or is required to refund said fee to McKinley. Accordingly the Complaint, broadly construed in favor of McKinley, the non-moving party, may state a claim for conversion as it is arguable that McKinley could have a right to possession of the Deposit.

However, McKesson also asserts that absent an allegation that the allegedly converted monies were maintained in a specifically identifiable fund, a cause of action for conversion fails. Defendant's Reply Memorandum at 5–6. Specifically, McKesson maintains that there is no allegation that the Agreement placed any restrictions on the use or disposition of the funds and that it was not required to hold or maintain the Termination Fee Deposit in a separately designated account pending McKinley's full compliance with the Agreement. *Id.* at 6–7. In contrast, McKinley argues that no such requirements pertain to a conversion claim. Plaintiff's Reply Memorandum at 3–4.

McKinley relies on *G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F.Supp. 895 (S.D.N.Y.1994), in support of its argument that a cause of action for conversion does not require the funds allegedly converted be maintained in a separate account so long as "such money can be described or identified in the same manner as specific chattel." *Id.* at 4 (quoting *G.D. Searle & Co., supra*, at 912). Such reliance is, however, misplaced. At issue in *G.D. Searle & Co., supra*, was whether a pharmaceutical corporation which had contracted with a symposium services provider could state a conversion claim against the provider in connection with the provider's failure to pay funds advanced by the corporation to particular third parties. *Id.* The court explained that an action for conversion lies "where there is an obligation to return or otherwise treat in a particular manner the money in question, and such money can be described or identified in the same manner as a specific chattel." *G.D. Searle & Co., supra*, at 912 (citing cases). The court continued that "[n]evertheless, New York courts are clear that money can be the subject of conversion and a conversion action only when it can be described, identi-

fied, or segregated in the manner that a specific chattel can be, and the mere failure to pay a debt is not a conversion of the money owing." *Id.* The court held regardless of the purpose of the corporation's payments to the provider, no conversion claim could be stated where the provider was under no obligation to remit particular, identifiable funds to the third parties or to segregate those funds into separate accounts. *Id.*

Similarly, in the instant case, McKesson was never required to segregate and maintain the Termination Fee Deposit in a separate account, nor to remit it, or any portion thereof, to any specific party including McKinley. Accordingly, the Complaint fails to state a claim for conversion and McKesson's motion to dismiss that claim should be GRANTED.

On this record, McKesson's motion to dismiss for failure to state a claim should be GRANTED as to both of McKinley's asserted claims. However, should the District Judge find that the Complaint does state a claim under either theory, McKesson should be permitted to serve, within 10 days of the District Judge's decision, an answer asserting a counterclaim against McKinley. *See* Discussion, *supra,* at 188–89.

### C. *Attorneys' Fees*

McKesson also seeks to recover its attorneys' fees incurred in connection with this action if it prevails, as provided for by ¶ 14 of the Lease Termination Agreement. Defendant's Memorandum at 15–16. McKinley has not responded to this argument.

█ Although in federal practice, the general rule is that each party bears its own costs of litigation, including attorney fees, if the parties have agreed by contract to permit recovery of attorneys' fees, a federal court will enforce that right provided the contract is valid under applicable state law. *McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1312–13 (2d Cir.1993) (citing cases and 6 James W. Moore et al., MOORE'S FEDERAL PRACTICE, § 54.78[1] (2d ed.1993)). Under New York law, a successful litigant may recover its attorneys' fees incurred in litigation only if provided for under contract or statute. *See Chapel v. Mitchell,* 84 N.Y.2d 345, 618 N.Y.S.2d 626, 642 N.E.2d 1082, 1084 (1994) ("in the absence of any pertinent contractual or statutory provision with respect to the recovery of amounts expended in the successful prosecution or defense of an action, each party is responsible for its own legal fees."). Further, although a district court generally has broad discretion in considering whether to award attorneys' fees such than an award may be set aside only for an abuse of discretion, "where a contract authorizes an award of attorneys' fees, such an award becomes the rule rather than the exception." *McGuire, supra,* at 1313 (citing cases).

Pursuant to ¶ 14 of the Lease Termination Agreement,

> [s]hould any suit be brought to enforce or interpret the terms of this Agreement or any obligation herein, the prevailing party, either by way of settlement or by judgment, shall be entitled to recover its reasonable attorneys' fees, costs and expenses.

Lease Termination Agreement ¶ 14.

Accordingly, should the District Judge agree that summary judgment should be granted in McKesson's favor, or that the Complaint should be dismissed for failing to state a claim, then McKesson is entitled to recover its attorneys' fees incurred in defending this action. In that case, McKesson shall, within 10 days of the District Judge's decision, submit its application for attorneys' fees, including an affidavit and schedule of such fees incurred, to the court. Alternatively, if the District Judge finds that summary judgment should not be granted in McKesson's favor, but finds the Complaint states a claim for money had and received or for conversion, then whichever party ultimately pre-

vails would be entitled to recover its attorneys' fees.

## CONCLUSION

Based on the foregoing, Defendant's motion (Docket Item No. 2) to dismiss should be GRANTED and, alternatively, for summary judgment should be GRANTED; Plaintiff's cross-motion for summary judgment (Docket Item No. 10) should be DENIED. However, should the District Judge deny Defendant's motion to dismiss and for summary judgment, summary judgment in favor of Plaintiff should not be entered as Defendant must be permitted an opportunity to serve, within 10 days of the District Judge's decision, an answer asserting counterclaims, as provided for under Fed.R.Civ.P. 12(a)(4)(A).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

June 22, 2000.